Ross J. LANINGHAM

v.

The UNITED STATES.

No. 109–81C.

United States Claims Court.

May 31, 1983.

538

Robert C. Liotta, Washington, D.C., for plaintiff.

Beacham O. Brooker, Jr., Washington, D.C., with whom was Asst. Atty. Gen., J.

Paul McGrath, Washington, D.C., for defendant.

## OPINION ON CROSS–MOTIONS OF THE PARTIES FOR SUMMARY JUDGMENT

GIBSON, Judge:

This is a military pay case premised on 28 U.S.C. § 1491. Plaintiff, a Lieutenant Commander in the United States Naval Reserve, seeks certain disability pay and allowances [1] and various other monetary and equitable relief, alleged to be due him as a result of an injury sustained in an automobile accident on June 9, 1978, while serving on active duty for training. Plaintiff demands all such pay and allowances in arrears from the date of his injury to the present, with a set-off for all of the disability pay and allowances received by him during the period September 6, 1979, through June 30, 1980, inclusive. To remedy the denial of the foregoing disability pay, plaintiff made applications to the Board for the Correction of Naval Records (BCNR) on October 3 and 15, 1980, and both applications were denied.

This case is now before the court on the parties' cross-motions for summary judgment. For reasons stated below, the court concludes that there is no genuine issue as to any material fact concerning the issue of liability. Because we find that plaintiff was *not* entitled to disability pay for the June 9, 1978 to September 6, 1979 period under applicable laws and regulations, and because we find, in view of applicable regulations, that plaintiff's disability pay and allowances were improperly terminated on June 30, 1980, we grant defendant's motion as to the former period and deny it as to the latter and, conversely, deny plaintiff's motion as to the former and grant it as to the latter. We also deny defendant's motion on

its counterclaim for reimbursement of disability pay and allowances paid to plaintiff from September 6, 1979 to June 30, 1980.

## FACTS

Plaintiff enlisted in the United States Naval Reserve on September 30, 1961. On February 21, 1967, he entered upon extended active duty as a Naval Flight Officer candidate, and was commissioned in May, 1967. He also completed Flight Officer training in May, 1968. For approximately four and one-half years, plaintiff served on active duty including time on the U.S.S. Enterprise in Vietnam, and has been a member of the Ready-Reserve (USNR–R), affiliated with the Naval Air Reserve Unit (NARU), Norfolk, Virginia, since his release from active duty in August, 1971. Plaintiff's specialty is that of a Naval Flight Officer, with a subspecialty of Airborne Air Control Officer/Combat Information Officer.

On June 9, 1978, plaintiff was involved in a rear-end collision in Torrance, California, while driving off base during an authorized liberty which was within a period of active duty for training (AcDuTra). At the start of that training period, plaintiff had certified that there had been no adverse change in his medical condition since his most recent physical examination. He also prospectively signed a "chit," to take effect at the end of the period, which was to the effect that there had been no adverse changes during the interim. Plaintiff made no effort, however, to alter that latter certification after the accident.

The officer-in-charge of plaintiff's squadron knew of the accident shortly after its occurrence although plaintiff filed no formal report at that time, nor was he instructed to file such by the officer-in-charge.[2] At plaintiff's next reserve drill on

1. Plaintiff initially filed a *pro se* complaint for monetary damages in the United States District Court for the District of Columbia as well as a motion for injunctive relief in October, 1980. A copy of the docket card for that case indicates that counsel made an appearance on behalf of plaintiff on November 13, 1980. Said case, pursuant to defendant's motion, was transferred to our predecessor court, the United States Court of Claims, on February 26, 1981.

2. The officer-in-charge apparently overheard other squadron members talking about damage to plaintiff's automobile, resulting from the ac-

July 28, 1978, he reported to the NARU, Norfolk Medical Department, for treatment of neck pains arising out of the foregoing accident. At that time, the doctor prescribed certain drugs but did not remove plaintiff from flight status, and he, therefore, resumed his normal flight duties.[3] Upon subsequent complaints of neck pain, plaintiff was referred to the National Naval Medical Center (NNMC) in Bethesda, Maryland, for examination on November 20–21, 1978. Doctors at the NNMC decided to continue the medication, and further prescribed that plaintiff wear a soft cervical collar and perform certain isometric exercise.

Several months thereafter, plaintiff underwent his annual flight physical on April 28, 1979, at which time he was found fit for flight duty with the notation by the examining physician "No Sig. Change Since Last P.E."[4]

Plaintiff's neck problems persisted and he again sought medical assistance in August, 1979 when he went to Andrews Air Force Base for treatment. There he was informed that he could not be treated without a so-called "Notice of Eligibility (NOE)," which is issued in the case of disabled reservists and authorizes military medical treatment and disability pay and allowances. On his next drill weekend, sometime in late August, 1979, plaintiff reported to NARU Norfolk Medical Department and inquired about receiving a NOE on account of his neck injury and was informed that in order to secure the same, he would have to

be grounded. Since he was about to go on active duty training in Panama, plaintiff sought and obtained permission from the Chief Flight Surgeon at Norfolk to continue in flight status until he returned from Panama in early September.

On or about September 6, 1979, after his return from Panama, plaintiff was grounded by medical personnel in Norfolk on account of his neck condition, and he was informed that a speedletter was sent to the Chief of Naval Reserve for the issuance of a NOE which would entitle him to treatment. A "line of duty" investigation on plaintiff's accident in June, 1978 was also being performed about this time, incident to the issuance of the NOE.

On October 3, 1979, while awaiting the issuance of his NOE, plaintiff received a notice that he had been placed in a Category I, non-drill non-pay, status on "Records Review." The transfer was dated September 21, 1979, but retroactive to September 6, 1979, the date of his grounding due to the neck injury.[5]

The NOE, by which plaintiff began to receive the full pay and allowances of a regular Navy lieutenant commander as his disability benefits, was issued to plaintiff by the Chief of Naval Reserve on October 11, 1979. It was inaccurate, however, to the extent that it referred to plaintiff's "illness" rather than his "injury," and it listed the date of the "illness" and of plaintiff's resulting disability as June 9, 1979. Plaintiff reported these inaccuracies, and on November 26, 1979, a corrected NOE was is-

---

cident. The executive officer of the squadron also knew that an accident had occurred, although the point in time that he acquired this information is unclear from the record. Defendant's Exhibit E, pp. 12, 29.

3. In connection with his claim for retroactive disability benefits discussed below, plaintiff contends that the prescription of medication should have resulted in his immediate grounding from flight duty. However, as defendant points out, the regulation relied on by plaintiff, OPNAVINST 3710.7k, section 722E(1)(a), states only that the taking of drugs shall be considered "sufficient cause" for a recommendation of grounding by appropriate personnel. It does not mandate grounding.

4. Plaintiff objects to the remark on the report of this examination that plaintiff was not on medication, when other medical records clearly indicate that he was. However, the taking of prescription drugs is not a determinative factor in these proceedings, as is indicated by footnote 3, *supra*.

5. Plaintiff states that the procedure by which this status transfer was effected was not in accordance with applicable regulations. However, he has not otherwise raised this matter as an issue in this litigation.

sued to plaintiff which referred to his "injury" and to the correct date thereof as June 9, 1978. However, the date of disability was changed, not to conform with the actual date of injury, *i.e.,* June 9, 1978, but to conform with the date of plaintiff's grounding, *i.e.,* September 6, 1979.

In view thereof, on December 16, 1979, plaintiff wrote to the Chief of Naval Reserve via his commanding officer seeking to have the date on which disability benefits commenced as reflected on his NOE backdated to June 9, 1978, the date of the automobile accident in California which brought on his neck condition. That request was *negatively* endorsed by the commanding officer, who wrote to the Chief of Naval Reserve on January 5, 1980, stating, among other things that:

"This command conducted the Line of Duty investigation in good faith. Later events show many inconsistencies in this case. It is felt that [plaintiff] has been less than above board with all parties. It is apparent from his actions since the accident that if injuries were incurred they did not hamper his functioning as a drilling reservist. This command recommends that a more stringent investigation and medical examination be done before any final disposition of this case." [6]

Notwithstanding the foregoing letter of his commanding officer, plaintiff persisted in his efforts to have the commencment date for the payment of disability benefits on his NOE backdated, but without success. Naval medical authorities in the interim recommended that plaintiff undergo further physical examinations to determine his qualification for retention in the USNR and that a Medical Board report on his condition. As will more fully appear in the discussion below, this recommendation set in motion plaintiff's processing through the Navy's retirement for disability evaluation system, which was one step removed from the *temporary* disability process for reservists through which plaintiff initially sought relief.

A Medical Board was, therefore, convened in plaintiff's case on March 14, 1980, and found plaintiff to be suffering from "Cervical Sprain, Chronic" with a poor prognosis. The Board recommended that plaintiff's case be referred to a Physical Evaluation Board. Accordingly, on May 5, 1980, the Central Physical Evaluation Board reviewed plaintiff's medical records and found him "fit for duty." Plaintiff disagreed with that finding and requested a formal hearing before a regional Physical Evaluation Board (PEB) which was held on June 17, 1980. The PEB also found plaintiff "fit for duty," to which finding plaintiff objected in a letter to the Physical Review Council dated July 10, 1980.

It should be noted, at this point, that plaintiff had been receiving the full disability pay and allowances appurtenant to his rank, as if he were on full-time active duty in accordance with the provisions of the NOE (issued November 26, 1979) from the September 6, 1979 date of disability noted on its face. This was in accordance with statutes and Navy regulations concerning reservists injured in the line of duty, which will be discussed below. Apparently in reliance on the decision of the PEB of June 17, 1980, that plaintiff was "fit for duty," his disability pay was terminated by the Navy Finance Center as of June 30, 1980. Plaintiff was not, however, restored to any military duties at that date, either as an aviation officer or in any other capacity, and was apparently continued in the Category I, non-drill non-pay, status on "Records Review."

In response to plaintiff's July 10, 1980 rebuttal letter to the PEB findings of June 17, 1980, the Physical Review Council ap-

---

**6.** This letter from plaintiff's commanding officer occasioned the filing of a "complaint of wrong" by plaintiff under Article 138 of the Uniform Code of Military Justice, which sought to have the letter withdrawn. The record of the investigation subsequently conducted and the conclusion reached on the Article 138 complaint is included in the record in this case as Exhibit E. However, the court does not believe that those proceedings have a direct bearing on the issues raised herein.

proved the finding of "fit for duty" on August 1, 1980.

On September 11, 1980, plaintiff petitioned the Secretary of the Navy, pursuant to regulations, for relief from the Physical Review Council's affirmance of his being found fit for duty. This resulted in a letter from the Director, Naval Council of Personnel, to the Naval Physical Disability Review Board (NPDRB) advising that, since no reservist was a member of the regional PEB (whose finding of "fit for duty" was affirmed by the Physical Review Council), another formal hearing should be held by the NPDRB. In preparation for the NPDRB hearing, the Executive Secretary of the NPDRB requested, through appropriate channels, that a de novo Medical Board be convened to report on plaintiff's condition. That board reported on December 19, 1980, and recommended that plaintiff be returned to full duty commensurate with his rank.[7]

Plaintiff appeared with counsel at a hearing before the NPDRB on March 20, 1981, and presented a number of objections to events occurring in the processing of his case, as described above, and to the validity of the NPDRB proceeding itself. The NPDRB nonetheless concluded on March 27, 1981, that plaintiff was "fit for duty" and that relief from prior similar determinations within the disability evaluation system was not warranted.

While matters pended before the NPDRB, plaintiff also requested of the Secretary of the Navy by letter dated October 3, 1980, that the disability payments terminated on June 30, 1980, be resumed pending "final disposition" of the question of his disability. Plaintiff also filed two applications with the Board for the Correction of Naval Records dated October 3, 1980, and October 15, 1980. The first application requested that the NOE issued on November 26, 1979, be amended to show that plaintiff's disability was incurred on June 9,

1978, rather than September 6, 1979, thereby entitling plaintiff to back disability pay. The second application sought the resumption of disability payments from the Navy Finance Center as of July 1, 1980. The BCNR denied plaintiff's requests without a hearing by letter dated March 20, 1981.

Notwithstanding the denial of his application for relief to the BCNR and the finding of fitness for duty by the NPDRB in March, 1981, plaintiff had not been restored to his flight officer duties or to any other duties at the time he filed his cross-motion for summary judgment on March 23, 1982. Nor had it been medically determined that plaintiff had recovered sufficiently to perform his normal military duties. Plaintiff apparently underwent a flight physical on July 19, 1981, the results of which were forwarded to his reserve unit's medical department on August 5, 1981. In response to his request to be returned to duty, however, plaintiff's commanding officer informed him that his flight physical had been forwarded to the Bureau of Medicine and Surgery (which has jurisdiction over flight fitness) for determination of his flight duty fitness and that a response was not expected for six to eight weeks. A similar response was elicited on December 10, 1981, to the same request. By letter dated May 4, 1982 (included as an exhibit to plaintiff's reply to defendant's opposition to plaintiff's cross-motion for summary judgment), plaintiff was informed by the Naval Military Personnel Command that he had been assigned Physical Risk Classification "5," i.e., "not physically qualified/suitable for retention in the naval service by reason of chronic cervical sprain and depressive reaction." The letter continued:

"As a result, you must elect one of the following options to resolve your Naval Reserve status:

a. Request transfer to the Retired Reserve (if eligible),

b. Resign your commission, or

should be reevaluated by the Psychiatry Department, though there is no orthopedic contraindication ...."

---

7. The Medical Board's report indicated that its examination disclosed no "other abnormality besides the chronic cervical strain," and further recommended that plaintiff's "flying status

c. Request a hearing before the Physical Evaluation Board."

In response to said letter, plaintiff requested a hearing before a physical evaluation board by letter of May 27, 1982. This letter essentially requested plaintiff's reprocessing under the retirement for disability evaluation system.[8]

## PARTIES' CONTENTIONS

In its motion for summary judgment, defendant casts this case in the posture of a judicial review of the actions of certain Naval administrative boards acting on behalf of the Secretary of the Navy, particularly the Naval Physical Disability Review Board (NPDRB) and the Board for the Correction of Naval Records. Defendant states that it is this court's duty to review the actions of the Secretary of the Navy, acting through those tribunals, and decide whether their determinations pertaining to plaintiff was arbitrary or capricious, or unsupported by substantial evidence, or contrary to applicable laws and regulations.

Defendant further contends that inasmuch as plaintiff was performing his normal military duties for at least a large part of the time for which he now seeks retroactive disability pay, the findings within the retirement for disability evaluation system that plaintiff was "fit for duty" are presumptively correct as a matter of law and justify the decisions of the BCNR refusing to grant plaintiff disability pay and allowances for the periods at issue. Defendant then notes that the various statutory and regulatory violations claimed by plaintiff in the disability evaluation process do not entitle him to relief absent a showing of prejudice and contends that since a finding of fitness for duty is not an "adverse" finding, plaintiff cannot show any prejudice. Defendant also argues that the termination of plaintiff's disability pay and allowances on June 30, 1980, was the lawful correction of a prior mistake, *i.e.,* that plaintiff was never entitled to any disability benefits in the first place in view of the determinations that he was "fit for duty."

■ Defendant then focuses on plaintiff's specific prayers for relief and further asserts (1) that this court lacks the injunctive power to order the military to restore plaintiff to the pay and allowances he was receiving under the terminated NOE; (2) that plaintiff is not entitled to disability pay for the June 9, 1978 to September 5, 1979 period when he participated in and was paid for drills and training with his Reserve unit;[9] (3) that his claims for retirement credits and the monetary equivalent of certain lost benefits are not compensable because they were not presented to the BCNR; (4) that punitive damages are not available against the United States; and (5) that the claims for costs and attorneys' fees must be determined in accordance with the Equal Access to Justice Act with which plaintiff has not yet complied.[10]

Finally, defendant argues in its counterclaim that inasmuch as the NOE, issued to plaintiff, was issued by the improper au-

---

**8.** On April 20, 1983, defendant filed with the court a motion for leave to file, as Exhibit G, a certified copy of the administrative record compiled in the course of plaintiff's reevaluation for disability retirement purposes since May 27, 1982. The court granted such leave over plaintiff's objection. Plaintiff's petition does not raise any issues concerning the proceedings recorded in Exhibit G. The court, however, has reviewed the exhibit thoroughly to determine whether a "final disposition" has been effected in plaintiff's case, the relevance of which will appear below.

**9.** Plaintiff is not claiming disability pay and allowances *in addition* to the pay he received for drills performed. As will appear below, defendant's argument goes to the question of plaintiff's fitness alone, not to double pay which plaintiff specifically disavows.

**10.** Defendant also responded to plaintiff's claims, in his petition, of discrimination in the administration of the disability laws and regulations on account of his reservist status which is prohibited by 10 U.S.C. § 277. Our disposition of the pertinent issues raised, however, rests on other grounds and plaintiff has not argued his discrimination claims in his opposition to defendant's motion, or in his own cross-motion for summary judgment. We therefore consider them abandoned. *B.D. Click Co. v. United States,* 225 Ct.Cl. 559, 561 (1980); *Ulman v. United States,* 214 Ct.Cl. 308, 314, 558 F.2d 1, 4 (1977).

thority, it was invalid, and all sums received by plaintiff under it should be reimbursed to the Government.

Plaintiff opposes defendant's motion and makes his own cross-motion for summary judgment. He begins with the broad assertion that defendant misdirects the court's focus in this case to the statutory provisions and the regulations dealing with retirement for disability rather than to those statutory provisions and regulations pertaining to disability maintenance payments for reservists injured during periods of active duty for training or drill. Plaintiff contends that under the latter regulations, his disability maintenance payments were illegally terminated because no "final disposition" respecting his military status had occurred at the time payments were terminated on June 30, 1980.

Plaintiff also notes a number of violations of statutory and regulatory provisions in the handling of his case through the Navy retirement for disability evaluation system. Assuming, without conceding, that actions taken in the course of that handling affect his entitlement to pay and allowances under a NOE, plaintiff argues that there were violations of the regulations governing the retirement for disability evaluation system which render those actions taken illegal.

With respect to the issue of backdating his disability payments to June 8, 1978, as opposed to the September 6, 1979 starting date marked on the NOE, plaintiff contends that, since he sustained his cervical injury on the earlier date within the meaning of applicable regulations and was in fact receiving medical treatment from Naval authorities as early as July, 1978, the payment of the back benefits would be merely a matter of the Navy conforming with its own records.

Plaintiff also states that the BCNR, which ruled on his applications, had before it considerable evidence that plaintiff's disability payments were wrongfully terminated, and that such benefits should have been paid under the applicable regulations from a starting date long before the one stated on his NOE. In view of the foregoing, plaintiff contends that the Board acted arbitrarily and capriciously by summarily resolving his applications against him without making any specific findings or explanation of its reasons. Plaintiff stresses the fact that the BCNR acted even before the NPDRB or the Director, Naval Council of Personnel Boards, had ruled on his requests for relief.

The parties submitted responses to each other's briefs-in-chief, the relevant points of which will be considered below.

### ISSUES

The court has carefully considered all the arguments of each party and reviewed the extensive administrative record in this case. It believes that the resolution of plaintiff's case hinges on the answers to the following issues:

(1) what statutes and regulations determine the standard for termination of disability pay and allowances to a reservist who is receiving the same by virtue of a NOE duly issued;

(2) whether a reservist is retroactively entitled to disability pay and allowances for a period, between the date of the accident which caused his injury and the time his NOE was actually issued, during which he was performing his full normal military duties and certifying his fitness for such duty throughout that time;

(3) whether a reservist whose disability pay and allowances, made in accordance with a duly issued NOE, were terminated pursuant to a finding of "fit for duty" under the DEM, *infra,* is entitled to the reinstitution of such benefits in that they were not properly terminated as required by SECNAVINST 1770.3;

(4) whether the Government, without establishing that it was prejudiced, is entitled to reimbursement of disability payments made to a reservist (whose entitlement is otherwise established) under a NOE which may have been issued by a technically non-designated authority; and

(5) whether the Government is entitled to reimbursement of disability payments made under a NOE duly issued because the recipient reservist is found "fit for duty" during the period of payment under the retirement for disability laws.

## DISCUSSION

### Scope and Standard of Review

This case involves decisions made at varying times by a variety of Naval medical officers and administrative boards. It is appropriate, therefore, that we should begin by discussing exactly what we are reviewing and what the standard of our review is. While plaintiff's complaints involve the actions of more than one individual or entity acting on behalf of the Navy, it is clear that the board whose decision most clearly denied plaintiff the overall relief he now seeks is that of the Board for the Correction of Naval Records (BCNR). It is true that the record before us includes, and the parties considered at various points in their briefs, decisions made within the Naval retirement for disability evaluation system subsequent in time to the BCNR decision. However, it became clear at oral argument that these latter decisions have only a tangential effect on the disposition of plaintiff's principal claims, and we will only be interested in the administrative history of plaintiff's case subsequent to the BCNR's decision for a limited purpose, as will more fully appear below.

The United States Court of Claims, our predecessor, elaborated on the role of Correction Boards and the proper scope of the court's review of their actions under 28 U.S.C. § 1491 in *Sanders v. United States,* 219 Ct.Cl. 285, 298, 594 F.2d 804, 811 (1979), wherein it stated that:

"Congress has acted by providing servicemen with an administrative remedy for their wrongs. Once a plaintiff has sought relief from [a] Correction Board, such plaintiff is bound by that board's determination unless he can meet the difficult standard of proof that the Correction Board's decision was illegal because it was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, and money is due."

The Court of Claims has also held that for a plaintiff to merit judicial consideration of and relief from the actions of a Correction Board he or she must show "an unlawful act made so by violation of statute, or regulation, or published mandatory procedure, or unauthorized act . . . ." In short, the Board's actions must be "so unsupported by the evidence as to be a gross injustice, unlawful because of clear legal or factual error, manifest abuse of discretion, or arbitrary and capricious action amounting to bad faith or fraud, and seriously prejudicial." *Skinner v. United States,* 219 Ct.Cl. 322, 333, 594 F.2d 824, 830 (1979). *See also Haldane v. United States,* 1 Cl.Ct. 691, 693 (Nettesheim J.) (1983).

### Applicable Statutes and Regulations

In this case, the parties have brought to the court's attention, by asserting them interchangeably, two sets of statutes and regulations relating to the entitlement to and the termination of disability pay and allowances for members of the armed forces. The first set is contained in 10 U.S.C. §§ 1201 *et seq.,* and the regulations issued thereunder are compiled in the 1977 Disability Evaluation Manual (SECNAVINST 1850.4, June 23, 1977) (hereinafter DEM). This statutory and regulatory scheme authorizes the separation or retirement, or placement on a temporary disability retired list, of members of the armed services on active duty or inactive duty for training, when it is determined by various authorities and panels, acting under the aegis of the Secretary of the particular military department concerned, that a member is unfit to perform his military duties on account of the physical disability.

The standard of fitness in determining qualification under the retirement for disability system is set forth at DEM ¶ 0207, which states that "[a] member is 'unfit be-

cause of physical disability' when he is unable, because of disease or injury, to perform the duties of his office, grade, rank or rating in such manner as to reasonably fulfill the purpose of his employment on active duty." Subsection b. of that paragraph *excludes* from the requirements of general fitness for duty, the requirements of "special hazardous duty, such as duty involving flying, etc., . . . ." In other words, in the case of an aviation officer, it is entirely possible to be found "fit for duty" within the foregoing statutes and regulations under the retirement for disability evaluation system and still not be "fit for duty" involving flying.

The second set of rules determining a serviceman's eligibility to receive disability pay and allowances are applicable specifically to *reservists* disabled in the line of duty and are contained in 10 U.S.C. § 6148, 37 U.S.C. § 204(g) and (i), and SECNAVINST 1770.3. 10 U.S.C. § 6148 provides in pertinent part that:

> "(a) A Member of the Naval Reserve . . . who is ordered to active duty, or to perform inactiveduty training, for any period of time, and is disabled in line of duty from injury while so employed, . . . is entitled to the same pension, compensation, death gratuity, and hospital benefits as are provided by law or regulation in the case of a member of the Regular Navy . . . ."

37 U.S.C. § 204(g) and (i) provide correspondingly that a Naval reservist disabled in the line of duty shall be entitled to the same pay and allowances as members of the Regular Navy.[11]

Against this background and with the differences between regulars and reservists in mind, no doubt, the Secretary of the Navy issued Instruction 1770.3 (August 17, 1973) (hereinafter SECNAVINST 1770.3) to govern the claims and disbursement of disability and death benefits to Navy and Marine Corps reservists.[12]

Under SECNAVINST 1770.3 ¶ 6a., reservists on active duty for training or inactive-duty training (drill) "shall be instructed" by their commanding officer to report injuries received or illnesses contracted during such periods and in each case a medical examination, preferably by a naval physician, shall be conducted and a report issued to the commanding officer. A "line of duty" investigation is also required to be conducted when a reported injury might result, among other things, in the member's inability to perform duty for a period exceeding 24 hours, or is likely to be the basis of a claim against the Government. Upon receipt of proper notification and a review of the facts, the appropriate authority (either the Chief of Naval Reserve, Chief of Naval Personnel or the Commandant of the Marine Corps) issues the reservist a NOE under SECNAVINST 1770.3 ¶ 8. This NOE then entitles the disabled reservist to appropriate pay and allowances in accordance with 10 U.S.C. § 6148 and 37 U.S.C. § 204(i).

The court notes that the definition of "disability" for purposes of SECNAVINST 1770.3 is substantially different than it is under the DEM ¶ 0207, *supra*. At SECNAVINST 1770.3 ¶ 3e., it is defined as follows:

> "Disability as used herein means temporary or permanent unfitness to perform *the normal military duties to which assigned.* In some instances, eligibility for disability pay and allowances may accrue without hospitalization or may continue beyond a period of inpatient care when a reservist is not physically fit to perform

---

11. As defendant points out in its brief, the provisions applicable to reservists allow a disabled reservist to be paid as if he were performing full-time active duty, rather than the usual pay to reservists for actual days worked (three or four) per month. The theory is that if such reservists cannot perform their military duties, they are also probably unable to perform their civilian duties, and the military should therefore bear the obligation to maintain them, as it maintains regulars, until cessation of disability. Defendant's Brief, p. 8.

12. SECNAVINST 1770.3 ¶ 1 provides explicitly as follows: "Purpose. To revise the administrative procedures and guidelines for disability and death benefits for Navy and Marine Corps reservists provided for under 10 U.S.C. 6148 and 37 U.S.C. 204(i)."

*his normal military duties.*" [Emphasis added.]

It can readily be seen from a comparison of the two regulations that there is a fundamental difference between the definition of "disability" under the DEM and that under SECNAVINST 1770.3. Repeating the pertinent example given above in connection with the exclusion of *flight* duty standards under DEM ¶ 0207, we note that a reserve aviation officer injured in the line of duty may be disabled under SECNAVINST 1770.3 ¶ 3e., because he is unable to fly, even though he is capable of performing other military duties which are not "the normal military duties to which assigned." On the other hand, under the DEM standard, the same reservist would not be considered disabled for retirement purposes.

Once disability benefits commence pursuant to a NOE, they continue to be paid until they are terminated in accordance with the termination provisions of SECNAVINST ¶ 9c. (1), which states, *inter alia*, that:

"Pay and allowances shall terminate on the date that the reservist has recovered sufficiently to perform *his normal military duties*, or when *actually restored to normal military duty*, whichever occurs first. . . ." [Emphasis added.]

Paragraph 9c. (2) provides that disabled reservists receiving pay and allowances under a NOE shall be examined at least monthly in order to ascertain their fitness for duty.

It is apparent from its overall design and compass that SECNAVINST 1770.3 is meant to operate as a stop-gap procedural device for disabled reservists and is tailored to their specific needs, as opposed to those of disabled regulars. As such, plaintiff is correct in arguing that 10 U.S.C. § 6148 and 37 U.S.C. § 204(i), together with SECNAVINST 1770.3 are separate and distinct from 10 U.S.C. § 1201 *et seq.*, and the DEM which concern primarily the retirement for disability of regular Naval personnel.

There is, however, a point where SECNAVINST 1770.3 "kicks in," as it were, to the retirement for disability evaluation system for regular members of the Navy governed by these latter statutes and regulations. This occurs upon the applicability of SECNAVINST 1770.3, ¶ 10 entitled "Return to Limited Duty, Separation, or Retirement for Physical Disability," section a. of which states that:

"When a Notice of Eligibility [NOE] has been issued to a member hospitalized in a naval medical facility, and the medical officer is of the opinion that recovery is not anticipated or that the reservist is not expected to be fit for return to full duty within a reasonable period, *a medical board shall be convened and the case shall be managed as in the case of a regular member. . . . Pay and allowances shall continue in such cases until final disposition is effected.*" [13] [Emphasis added.]

The "kick-in" occurs in that medical boards and subsequent proceedings are governed by the DEM as part of the retirement for disability system on the assumption that a reservist referred for such processing may never return to duty.

*Termination of Plaintiff's Benefits under the NOE—June 30, 1980*

We now return to plaintiff's primary claim, that his pay and allowances under the NOE were improperly terminated on June 30, 1980. This issue was the subject of plaintiff's application to the BCNR on October 15, 1980. The BCNR's decision denying plaintiff relief states rather cryptically that:

"After careful and conscientious consideration of the entire record, the Board determined that insufficient evidence had been presented to indicate probable material error or injustice." [14]

---

13. Paragraph 10c. provides similarly that a reservist who is initially placed on restricted duty because of a disability shall also be referred to appropriate authorities for retirement for disability evaluation in the event it appears the reservist will be permanently unfit for full duty.

14. The most pertinent portion of the record before the BCNR appears to have consisted of comments and recommendations forwarded by the Naval Military Personnel Command (NMPC) in response to a request dated November 3, 1980, from the Chairman of the BCNR. The memorandum submitted to the BCNR by

We shall first address defendant's argument that because the June 17, 1980 Physical Evaluation Board (PEB) found plaintiff "fit for duty," plaintiff's pay and allowances under the NOE previously issued were properly terminated. The PEB's finding was based on the standard of fitness required by the retirement for disability system set forth in DEM ¶ 0207 quoted above. According to defendant, the general DEM standard of fitness is the correct criterion for judging fitness for purposes of determining whether disability payments to a reservist under a NOE should be continued or terminated. This is so, the Government contends, even though a reservist such as plaintiff may be unfit for duty involving flying yet may be "fit for duty" under the DEM standard which excludes flight fitness from consideration.

■ Conversely, plaintiff argues that, as a reservist, his eligibility for continued disability pay and allowances under the NOE must be determined in accordance with SECNAVINST 1770.3 in the first instance. We agree with plaintiff because we do not perceive plaintiff's claim, at this posture, as one arising from a denial of disability retirement pay under 10 U.S.C. §§ 1201 *et seq.* and the DEM. Therefore, we find that defendant's reliance on the fitness standard enunciated in the DEM and certain actions taken under other DEM provisions is misplaced for reasons discussed below.[15]

Our view that SECNAVINST 1770.3 is the correct regulation under which plaintiff's entitlement to benefits must be determined is based on the unequivocal language of the regulation itself. Paragraph 1 states that the purpose of SECNAVINST 1770.3 is:

"To revise the administrative procedures and guidelines for *disability* and death *benefits* for *Navy* and Marine Corps *reservists* provided for under 10 U.S.C. 6148 and 37 U.S.C. 204(i)." [Emphasis added.]

Paragraph 4, entitled "Scope of Benefits" states in part as follows:

"a. This instruction contains administrative *regulations* and procedures *applicable to officers* and enlisted personnel *of the Navy* and Marine Corps *Reserves* who are called or ordered to perform active duty, active duty for training, or inactive-duty training (drill) and *who may become entitled to disability* or death *benefits* under [10 U.S.C. § 6148 and 37 U.S.C. § 204] . . . ." [Emphasis added.]

It is clear that the foregoing, and thus other applicable provisions of SECNAVINST 1770.3, control plaintiff's case.

■ Focusing our attention, then, on SECNAVINST 1770.3 we note that a reservist's compensable disability is defined in ¶ 3e. in terms of temporary or permanent unfitness to perform the "normal military duties *to which [he is] assigned.*" [Emphasis added.] We believe that the clear import of this language is that plaintiff need only have been unfit for his duties as an aviation officer in order to be entitled to disability pay under the NOE, regardless of his fitness for other duties as an unrestricted line officer.

Next we consider the provisions of SECNAVINST 1770.3 governing the termination of pay and allowances under a NOE once granted.

Paragraph 9c. (1) provides in part that pay and allowances shall terminate on the date that the reservist has recovered, from

---

NMPC, dated February 11, 1981, rehearses a number of reasons why the NOE issued to plaintiff might have been improperly issued in the first place, but, concerning events after the issuance of the NOE, mentions only the fact that plaintiff had been evaluated "fit for duty" within the retirement for disability evaluation system. The NMPC's recommendation was that plaintiff's application for relief should be denied.

**15.** Plaintiff argues at one point that since this case involves entitlement to pay and allowances under 10 U.S.C. § 6148 and 37 U.S.C. § 204(i), the DEM must be deemed inapplicable, if for no other reason, because it has not been approved by the Secretary of Defense as required by 37 U.S.C. § 1001. SECNAVINST 1770.3, on the other hand, has been so approved as stated in ¶ 18 thereof. Because we find the DEM to be inapplicable to this case for other reasons, we need not reach the precise question raised by plaintiff's contention.

his line-of duty-injury or disease, sufficiently to perform *"his normal military duties,* or when actually restored to *normal military duty,* whichever occurs first." [Emphasis added.] Paragraph 9, which governs pay procedures generally, repeats in at least five separate places (including 9c. (1)) the phrase *"his normal military duties"* in reference to performance fitness and the commencement or termination of a reservist's disability pay. Additionally, inasmuch as the possessive adjective "his" also precedes the phrase "normal military duties" in the second sentence of the disability definition in ¶ 3e., it is in obvious reference to the "normal military duties to which assigned" quoted above. Collectively, these provisions all buttress our interpretation and construction of the regulatory standard that the entitlement to pay under a NOE is determined by an individual's fitness to perform those particular duties to which he had been assigned prior to the onset of disability. *See* B–148324, 48 Comptroller General 1 (1968).

■ The general standard of fitness under the DEM, then, is inapposite here and has no relevance insofar as effecting the termination of a reservist's temporary disability pay and allowances under a NOE. Therefore, we conclude that the finding of the PEB of June 17, 1980, that plaintiff was "fit for duty," was not a legally proper basis for the termination of plaintiff's pay and allowances as a reservist in view of the clearly applicable standard set forth in SECNAVINST 1770.3 ¶ 9c. (1).

■ Accordingly, for plaintiff's pay and allowances under the NOE to have been properly terminated under the first criterion of SECNAVINST 1770.3 ¶ 9c. (1), it must have appeared, as of June 30, 1980, that plaintiff had recovered sufficiently to perform *"his normal military duties."* We

interpret this phrase to mean plaintiff's military duties, previously assigned, as a Class 2 aviation officer.[16] The record, however, shows the contrary, in that plaintiff has not been authorized to perform *"his"* previously assigned duties as an aviation officer at any time subsequent to his grounding in September, 1979. This is an uncontroverted fact. It is clear beyond cavil, then, that the first criterion for *properly* terminating plaintiff's disability pay under ¶ 9c. (1) is not satisfied.

■ Paragraph 9c. (1) of SECNAVINST 1770.3 also provides a second basis upon which a reservist's disability benefits may be properly terminated. This arises when the disabled reservist is *"actually restored* to *normal* military duty."* [Emphasis added.] Thus, we must now review the facts to see if that has actually occurred.

The culmination of plaintiff's processing through the retirement for disability evaluation system resulted in a finding that he was "fit for duty" under the DEM standard by the NPDRB in March, 1981. However, the record indicates, and the facts are not in dispute, that plaintiff continuously remained, in spite of his requests for return to actual duty, in essentially the same "limbo" status of "Records Review" to which he was assigned on September 6, 1979. That was the date he was grounded, pending a determination of his fitness for flight duty. That status is a Category I, non-drill non-pay, classification.[17] It appears clear, therefore, that plaintiff's duty status was still unresolved as late as May 4, 1982. At that time, the Naval Military Personnel Command sent him the letter quoted in the facts above, announcing, as a result of his flight physical, that he was *not* even then fit for retention in the naval service. It also outlined plaintiff's three "options to resolve [his] naval reserve status."[18] It is

---

**16.** This accords with SECNAVINST 1770.3 ¶ 9c. (2) which defines *"his* normal military duties" to mean "those duties to which he would have normally been assigned had he not been disabled, . . . ."

**17.** Plaintiff has alleged that his actual transfer to "Records Review" was not effected in ac-

cordance with proper procedures. However, he has not argued this point as a basis for relief.

**18.** As we mentioned at the conclusion of the facts above, plaintiff chose to appear before a Physical Evaluation Board and begin evaluation for retirement for disability. Exhibit G con-

thus patently clear, then, that plaintiff was never *"restored to normal military duty"* [19] of any kind within the meaning of SECNAVINST 1770.3 ¶ 9c. (1).

 We next consider another basis, within the SECNAVINST 1770.3 scheme, which permits the termination of pay and allowances to a disabled reservist to whom a NOE has been issued. This procedure is provided for in ¶ 10 which is entitled "Return to Limited Duty, Separation, or Retirement." Paragraph 10a. envisages situations where a reservist (as here) "is not expected to be fit for return to full duty within a reasonable period," and is processed, like a member of the Regular Navy, in the retirement for disability system. In such cases, ¶ 10a. provides explicitly that *"[p]ay and allowances shall continue until final disposition is effected."* [Emphasis added.] The record before us indicates that plaintiff was referred for disability evaluation as a reservist to a Medical Board in March, 1980 on account of medical questions concerning his physical qualifications for retention in the Navy. The sharp question then is whether "final disposition" has ever been effected in plaintiff's case since that referral.

The phrase "final disposition" is not defined in SECNAVINST 1770.3. The court believes, nevertheless, that it is reasonable to conclude from the contexts in which it is used in ¶ 10 that what is contemplated by that phrase is either separation from the Navy for unfitness, or retirement for disability under the disability retirement laws. As is evident from our discussion above on the question of plaintiff's restoration to "normal military duty," our review of the record discloses that none of these events has occurred. *A fortiori,* "final disposition" has not occurred within the contemplation of ¶ 10, *supra.*

tains the record of those proceedings to April 19, 1983. *See* footnote 8, *supra.*

**19.** From its context in SECNAVINST 1770.3, ¶ 9c. (1), we believe that "normal military duty" as used in the phrase "restored to normal military duty" contemplates any duty status commensurate with a reservist's office, grade, rank or rating, not only "his" particular duty

Plaintiff, both in his petition and in his briefs, has raised issues contesting the validity of various boards and certain actions taken by them in the course of his processing through them under the disability retirement laws and regulations. At oral argument, however, both parties agreed that the dispositive issues in this litigation do not arise under the disability retirement laws and regulations governing the disability evaluation system. As a consequence, the court deems the arguments raised as to such alleged irregularities in those proceedings to have been abandoned. *Ulman v. United States,* 214 Ct.Cl. 308, 314, 558 F.2d 1, 4 (1977).

In summary, the foregoing discussion leads to three brief conclusions. First, under the governing regulations, SECNAVINST 1770.3, plaintiff has not been found fit [*i.e.,* recovered sufficiently] to return to "his normal military duties" *to which he was previously assigned* as a naval flight officer. Secondly, he has not "actually [been] restored to normal military duty" in that he has been continuously retained in the "Category I" status, as stated above. And lastly, no "final disposition" has yet occurred as a result of his processing through the retirement for disability evaluation system. Given the foregoing, it is the court's opinion that· that portion of the BCNR's decision of March 20, 1981, denying plaintiff relief from the suspension of payments under the NOE was illegal in that it was contrary to applicable law and regulations. There can be no doubt that plaintiff has been seriously prejudiced by the BCNR's decision in view of his significant financial loss in disability pay and allowances since June 30, 1980, and this court so finds.

prior to the onset of disability. The court's foregoing construction does not appear to be inconsistent with the parties' positions, both of which countenance the cessation of plaintiff's entitlement to disability pay and allowances upon his reassignment to a full duty status in the Naval Reserve, even if that status does not involve aviation duties.

The court would remark at this point that the parties have not cited, nor has our own research revealed, any court cases concerning the termination of disability pay and allowances to a reservist under a NOE. Our holding above, however, is consistent with an exhaustive discussion of the legislative history of the statutory provisions and prior Comptroller General decisions concerning reservists' entitlement to disability pay and allowances, and the issue when such pay and allowances should be terminated, which is contained in 52 Comp.Gen. 100 (1972). There the Comptroller General stated in part that:

"In 48 Comp.Gen. 1 (1968) we said with respect to an aviation pilot injured while on training duty that entitlement to pay and allowances continues until the member is physically qualified to perform his full and specialized duty of flying, but that if the Reserve member is capable of performing restricted or limited duty, under our decision 37 Comp.Gen. 558 'the actual return of such a Reserve member to a Reserve duty status' is 'the determinative factor in establishing the cutoff date' of pay and allowances and the member ceases to be entitled to pay and allowances when he is 'officially returned to a Reserve duty status.'

\* \* \* \* \* \*

"... the legislative history of the 1949 act [10 U.S.C. 6148] clearly shows that the event which would terminate disability pay is recovery of ability to perform military duty or a *final* decision is made in the case. . . .

"Entitlement to disability pay and allowances therefore terminates when the member recovers sufficiently to perform his military duties or when a *final* decision is made in his case, *such as completion of separation proceedings* if such proceedings are timely initiated and he is separated for disability with or without monetary disability benefits . . . .

"We now agree ... that neither the mere physical presence of an injured reservist at a regular drill of his military unit nor a conditional temporary assignment to limited duty in itself constitutes an event which should terminate entitlement of pay and allowances on account of an injury incurred in line of duty while performing military duty . . . ." [Emphasis added.]

*Id.* at 101–03. The mention of "completion of separation proceedings" in connection with the use of the word "final" supports our conclusion that plaintiff's maintenance in a Category I, "Records Review," status was certainly not "final" for purposes of a proper termination of his pay and allowances.

■ It has not escaped the court's attention that our holding will entitle the plaintiff to recover disability pay and allowances from July 1, 1980, to the point in time when "final disposition" is in fact effected in his case. We do not believe that such a lengthy time span was meant to be a normal period of disability pay and allowances under SECNAVINST 1770.3, which we have previously referred to herein as a "stop-gap procedural device for disability reservists," pending return to duty, separation from the Navy, or retirement for disability. *See e.g.,* Decision of April 4, 1973, 52 Comp.Gen. 667 (where reservist received disability pay and allowances for a few months before being discharged from Naval service by reason of physical disability). However, Government agencies are obligated to conform to their own regulatory standards. *Vitarelli v. United States,* 359 U.S. 535, 539, 79 S.Ct. 968, 972, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). Defendant did not do so in this case. The long period of disability entitlement under SECNAVINST 1770.3 in this case, therefore, arises directly from the Navy's own failure to process plaintiff's case with dispatch and for no other reason. And the record does not support a finding that plaintiff can be personally faulted for his continued maintenance in Category I status, because of his unfitness to perform flight duty.

### The "Relation-Back" Claim

We now turn to the subject of plaintiff's application to the BCNR dated October 3,

1980, seeking to have the effective date of the NOE corrected to read June 9, 1978, instead of September 6, 1979, as the commencement date of his disability. This position lays the predicate for plaintiff to claim payment of retroactive disability benefits from the date his injury was incurred. In the BCNR's letter to plaintiff of March 20, 1981, this application was also denied.

Plaintiff bases his so-called "relation-back" claim on a number of grounds. First, he claims that he reported his injury during the period of active duty for training in which the accident occurred and that he was under treatment and medication continually for the injury from as early as July, 1978. He asserts SECNAVINST 1770.3 ¶ 9c. (1) as the regulatory authority which contemplates the performance of certain duties by a disabled reservist even while in receipt of full disability pay and allowances. He further argues that the Navy improperly failed to follow its own regulations and medical records by not issuing him a NOE to begin with and then in not backdating it to June 9, 1978, after it was finally issued.

Defendant proffers two reasons why plaintiff should not prevail on his "relation-back" claim. The first is that he was not in fact disabled for the period in question. The second is that the NOE which was issued was invalid in the first place because it was issued by the wrong authority. Closely related to the second reason is defendant's claim that even if plaintiff was disabled at some point, he did not notify the proper authority in accordance with SEC-NAVINST 1770.3.

The court believes that defendant's argument as to the validity of the NOE and the question of plaintiff's notification of his injury to proper authority are relevant to the substance of defendant's counterclaim, but not to the "relation-back" claim. Since this latter claim can be disposed of on the basis of defendant's first argument, we shall consider the other issues in discussing the merits of the counterclaim, *infra.*

■ Turning then to defendant's first argument, we agree that plaintiff should not recover on his "relation-back" claim because he was not unfit to perform his normal duties under SECNAVINST 1770.3 until he was grounded on September 6, 1979. As the Naval Military Personnel Command stated in its memorandum to the BCNR, plaintiff performed active duty for training on at least six occasions between the date of his automobile accident and September 6, 1979. He flew more than 176 flight hours, executed carrier landings and a catapult assisted take-off, and performed over 100 drills between October 1, 1978 and September 6, 1979. He also certified to his good health on numerous occasions during this period.

Plaintiff does not contest these facts. He points, however, to the fact that he was under medical treatment for his neck pain from as early as July, 1978 (which is well documented in the record), and to SECNA-VINST 1770.3 ¶ 9c. (1) as contemplating the performance of certain duties by a disabled reservist even while in receipt of full disability pay and allowances.

First, we note that SECNAVINST 1770.3 ¶ 9c. (1) cited by plaintiff refers explicitly to "attendance" at drill and/or performance of "limited or restricted" duty as conduct that will not constitute restoration to normal military duties and thus will not justify termination of disability pay and allowances. It is clearly inapplicable to plaintiff, who in this case performed the *full* duties required of a Class 2 aviation officer during the period in question. Secondly, there is a presumption that a member of the military who performs his or her duty in a satisfactory manner (not to mention one who certifies his own fitness repeatedly as had plaintiff here) is presumed fit notwithstanding the fact that he or she may be suffering from certain ailments. *See Callan v. United States,* 196 Ct.Cl. 392, 399–400, 450 F.2d 1121, 1125 (1972).

Plaintiff argues that since he informed some Naval personnel of his accident in June, 1978 and was under treatment and medication for his resulting neck injury shortly thereafter, the Navy failed "to take appropriate action on the basis of [its] own

records," *i.e.,* it failed to issue plaintiff a NOE at an earlier effective date. However, we accord this argument no weight, and it clearly deserves none, in view of the record of plaintiff's performance of flight duty without complaint to squadron officials and continued certifications of good health and the attendant legal presumption, all as stated above.

In view of the foregoing, the court finds that the portion of the BCNR's decision of March 20, 1981, denying plaintiff's "relation-back" claim is legal and lawful in that it is supported by substantial evidence in the record, is not arbitrary or capricious, nor based on legal or factual error. That portion of the BCNR's decision is, therefore, affirmed.

*Defendant's Counterclaim*

We next consider defendant's motion for summary judgment on its counterclaim for sums it claims were illegally paid to plaintiff under the NOE. Defendant relies on its argument that the NOE was invalidly issued, *ab initio,* and then adds that the monthly fitness examinations of plaintiff (required for continued receipt of benefits under SECNAVINST 1770.3 ¶ 9c. (2)) were only to the effect that he was unfit for duty involving flying, but that plaintiff was otherwise "fit for duty" in view of the PEB findings of June 17, 1980.

As we stated previously, the validity of the issuance of the NOE is properly raised in connection with defendant's counterclaim and it is here that we shall consider it. Defendant first argues that plaintiff's injury did not become "manifest" until after the AcDuTra period during which the automobile accident occurred and that the NOE should have been issued, therefore, by the Chief of Naval Personnel, rather than the Chief of Naval Reserve.[20] The argument continues that, since the wrong authority issued the NOE, it was invalid, and payments to plaintiff thereunder were made beyond the scope of authority of defendant's agents. The Government concludes that it is therefore entitled to reimbursement of those payments.[21]

Rules governing the issuance of NOEs to disabled reservists are contained in SEC-NAVINST 1770.3, ¶ 8b., which provides, *inter alia,* that:

"The determination of eligibility and the issuance of the NOE are under the cognizance of the Chief of Naval Personnel .... This authority has been delegated to the following field activities, with the exceptions as indicated:

(1) *Navy Personnel.* Authority has been delegated to the CNAVRES [Chief of Naval Reserve]."

The pertinent exception pursuant to which the Chief of Naval Personnel issues the NOE is as follows:

"The Board was unable to find that your Notice of Eligibility date should be changed from 6 September 1979 to 9 June 1978, or that the suspension of pay by the Navy Finance Center was improper."

**20.** In its brief-in-chief, defendant states, at page 24, that ... "The BCNR found that plaintiff's injury was not manifest during the training period during which the NOE was issued, so that the NOE ... could have only been issued by the Chief of Naval Personnel, rather than the Chief of Naval Reserves [sic]." This assertion is a complete misstatement on defendant's part.

The validity of the NOE's issuance was not raised in plaintiff's application to the BCNR, and we are not in the posture of reviewing its actions with respect to this issue in regard to defendant's counterclaim. While the validity question was brouched in the NMPC advisory opinion to the BCNR, it was not referred to in the BCNR's decision which addressed only plaintiff's "relation-back" claim, and his claim that his disability payments were illegally terminated. The dispositive portion of the BCNR's decision stated only that:

**21.** Defendant cites *Scharaga v. United States,* 209 Ct.Cl. 728 (1976), for the proposition that the Government is not bound where its agents act without authority. However, that case is inapposite to the issue here in that we find that plaintiff is legally entitled to disability pay and allowances under SECNAVINST 1770.3. The distinction between the two cases is underscored by the fact that the Court of Claims found that plaintiff in *Scharaga* was not entitled, pursuant to the applicable statutes and regulations, to the funds to which the Government claimed reimbursement.

"(c) *Those cases where the condition becomes manifest after release from duty.*" [Emphasis added.]

Plaintiff strenuously contends that his injury was "manifest" during the AcDuTra period in which the automobile accident occurred and consequently the NOE was issued by the proper authority, *i.e.,* the Chief of Naval Reserve. He claims in his briefs, and argued strenuously at oral argument, that to the extent there is a dispute on this point of fact, there is presented to the court a "genuine issue of material fact" under RUSCC 56 and therefore summary judgment is inappropriate on defendant's counterclaim. The court has reviewed the record in connection with the determination of whether plaintiff's neck condition was "manifest" during, or only after, the duty period in which the accident occurred, and we agree with plaintiff only with specific reference to the point that this question raises an issue of fact.[22]

It is well settled that summary judgment cannot be granted when a *material* issue of fact is presented. *Inland Oil & Transport Co. v. United States,* 600 F.2d 725, 727 (8th Cir.1979), *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). However, an issue is only "material" if the facts alleged are such as to constitute a legal defense, or are of such a nature so as to affect the results of an action. *Romero v. Union Pac. R. Co.,* 459 F.Supp. 741, 746 (D.Wyo. 1978), *vacated and remanded on other grounds,* 615 F.2d 1303 (10th Cir.1980). On the other hand, where an issue of fact is not relevant to the resolution of a controlling legal issue, it is not "material" so as to preclude summary judgment. *See United States v. Sumitomo Shoji, New York, Inc.,* 63 C.C.P.A. 79, 534 F.2d 320, 324 (1976). It is our function now, then, to determine whether the question as to when plaintiff's condition became "manifest" is determinative with respect to the resolution of a controlling legal issue—in this case that issue being the validity of the NOE issued to plaintiff.

At oral argument defendant attempted to explain that where a disabling condition which would otherwise entitle a reservist to disability benefits does "manifest" itself during a period of active duty or inactive-duty training (drill), its connection to "line of duty" activity can be *easily* verified. However, when it only becomes manifest *after* release from duty, its connection to the "line of duty" is not always so clearly evident. In the latter case, it is contended, the regulations require the Chief of Naval Personnel to issue the NOE. The rationale is that the Chief of Naval Personnel has a large investigative staff at his disposal, which is capable of verifying the facts before the NOE is issued, in contradistinction to the Chief of Naval Reserve, whose staff, defendant alleges, is not as large.

The import of defendant's argument, then, although not phrased in so many words, is that the Government is prejudiced in having to pay out disability benefits to a reservist (who might be otherwise entitled to the benefits) whose injury was not "manifest" during a period of active duty or drill when a technically non-designated authority, without a comparable staff to carry out a substantially equivalent investigation of relevant facts, issues the NOE.

We shall now examine the pertinent regulations governing the issuance of a NOE to determine whether indeed the Government could have been prejudiced by the fact that the Chief of Naval Reserve issued the NOE in this case, as opposed to the Chief of Naval Personnel, assuming, *arguendo,* that plaintiff's injury was "manifest" after his release from duty.

The threshold investigation that must be conducted in the case of injured reservists is provided for in SECNAVINST 1770.3 ¶ 6,

---

**22.** In determining the existence of an issue of fact on the manifestation issue, the court does not rely on assertions made in the parties' legal briefs and at oral argument which do not constitute evidence creating issues of fact. *See British Airways Board v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979), *reh. denied,* 441 U.S. 968, 99 S.Ct. 2420, 60 L.Ed.2d 1074 (1979). Rather, the court relies on the administrative record before it.

entitled "Action by Commanding Officer," section c., which states in pertinent part that:

> "Whenever ... an injury is incurred which might result in a permanent disability or which results in a member's inability to perform duty for a period exceeding 24 hours, or is likely to be the basis of a claim ... against the Government, a fact-finding body *should* be convened in accordance with Chapter VIII of reference (c) [Manual of the Judge Advocate General (JAGMAN)]. Special instructions concerning reservists are also contained in paragraph 0911 of reference (c).... *The appointment of a fact-finding body in accordance with reference (c) is considered the appropriate means by which to insure that an adequate official record is made concerning the circumstances surrounding the incidents.*" [Emphasis added.]

JAGMAN, Chapter VIII is entitled "Line of Duty and Misconduct (Injury, Disease, and Death)" and contains provisions governing the formation, conduct, and report of fact-finding bodies with the purpose of producing an "adequate report concerning the circumstances" under which a Naval reservist is injured. Our review of the JAGMAN provisions does not indicate that either the Chief of Naval Personnel or the Chief of Naval Reserve, or their respective staffs, have any function or authority in connection with the "line of duty" investigations conducted thereunder. Rather, it is plain from SECNAVINST 1770.3 and the JAGMAN provisions that the disabled reservist's commanding officer is apparently the prime mover in such investigations. The court would also emphasize that there are no provisions in SECNAVINST or the JAGMAN differentiating between the scope of investigations of injuries where the condition becomes "manifest" *after* release from duty from those where it "manifests" itself *during* the active duty or drill period in which an accident occurs.

Returning again to SECNAVINST 1770.3 ¶ 8, we note that ¶ 8a. states in connection with the duty of the issuing authority of a NOE that:

> "... the appropriate authority listed below [*i.e.,* the Chief of Naval Reserve or Chief of Naval Personnel in the case of Naval reservists] *shall review all of the information provided* [by the reservist's commanding officer], *obtain any additional data required to make a determination as to the member's eligibility for disability benefits,* and if in his opinion the reservist concerned is eligible to receive the benefits authorized by 10 U.S.C. 6148 and 37 U.S.C. 204(i), shall prepare and forward to the reservist the NOE .... *If there is any doubt as to his eligibility, a speedletter shall be submitted containing all pertinent facts, circumstances, and records to the Chief of Naval Personnel ....*" [Emphasis supplied.]

It is apparent from these provisions that whether the Chief of Naval Reserve or the Chief of Naval Personnel is the proper authority to issue a NOE in a given case, neither has the primary duty to conduct the "line-of-duty" investigation. The issuing authority's primary duty is only to "review" the information provided him, regardless of whether it is the Chief of Naval Reserve or the Chief of Naval Personnel. We therefore believe that defendant's concern for the greater ability of one authority over the other to conduct investigations (a contention that is unsupported by anything in the record or citations supplied by defendant) is misplaced.

The court is aware that SECNAVINST 1770.3 ¶ 8a. does contemplate the possible need of the NOE issuing authority to "obtain any additional data required to make a determination as to the [Reserve] member's eligibility for disability benefits," and that a larger investigative staff on the part of one authority might be of some benefit. However, that paragraph also provides that where there is "*any* doubt as to eligibility" (which would certainly be the case where the Chief of Naval Reserve needed more information and was unable to obtain it with the staff at his disposal), the matter shall be forwarded to the Chief of Naval Personnel in any case. Here, the record

does not contain any evidence that the Chief of Naval Reserve had any doubt as to the propriety of issuing plaintiff the NOE in question either on October 11, 1979, or even after plaintiff sought a corrected version, on November 26, 1979.

In the case before us, the record indicates that the Chief of Naval Reserve issued plaintiff the NOE at issue under the following circumstances: (1) a JAGMAN investigation was conducted which indicated that plaintiff sustained an injury in the line of duty while performing active duty for training on June 9, 1978;[23] (2) the NARU Norfolk Medical Department grounded plaintiff on account of the neck injury on September 6, 1979; (3) plaintiff was transferred concurrently with his grounding to "Records Review," Category I (non-drill non-pay) status as being not physically qualified; and (4) a military medical opinion by one Lieutenant Commander Bakshi was in the record to the effect that the disability existing on September 6, 1979, was the result of the injury incurred on June 9, 1978.

Additionally, it is noteworthy to observe that defendant does not claim that the JAGMAN investigation conducted was deficient in any respect; defendant does not claim that there were any inaccuracies in plaintiff's medical records; and it does not claim that the Chief of Naval Personnel would have acted any differently in plaintiff's case than did the Chief of Naval Reserve, in the face of the facts presented, with respect to the propriety of issuing the NOE. Defendant also does not claim that any doubt existed at the time the Chief of Naval Reserve issued the NOE to plaintiff which should have caused him to forward the matter to the Chief of Naval Personnel. Nor is this a case where plaintiff himself can be said to have had a hand in causing the Chief of Naval Reserve, rather than the Chief of Naval Personnel, to issue the NOE, to defendant's detriment. In view of the above, we do not see, on these facts, how defendant was prejudiced in the circumstances of this case assuming, without deciding, that the Chief of Naval Reserve was not the designated authority to issue plaintiff's NOE in the first place.

A litigant is required to show demonstrable prejudice to support a charge of procedural error. A rule allowing technical procedural infractions to control the outcome of a case, without a showing of prejudice flowing therefrom, would promote form over substance. See *Gratehouse v. United States,* 206 Ct.Cl. 288, 300–01, 512 F.2d 1104, 1111 (1975); see also *Huling v. United States,* 185 Ct.Cl. 407, 412–13, 401 F.2d 998, 1001 (1968); *Campbell v. United States,* 2 Cl.Ct. 247, 249–250 (1983) (Mayer J.). We come to the conclusion, therefore, that, with the absence of any demonstrated prejudice to the defendant and in the particular circumstances of this case, assuming, *arguendo,* the possible violation of procedural rules in the issuance of plaintiff's NOE by the Chief of Naval Reserve instead of the Chief of Naval Personnel it is so technical as to be inconsequential, and constitutes harmless error, if any. See *Huling, id.; Polos v. United States,* 223 Ct.Cl. 547, 557, 621 F.2d 385, 390 (1980).

The foregoing compels the conclusion, therefore, that the validity of the NOE issued to plaintiff should not turn solely on the question, under these facts, of which authority issued it. Because of this, we find that the factual dispute as to when plaintiff's condition became "manifest" has no substantial bearing on a "controlling legal issue" and it is therefore not a "*material*" question of fact that would preclude the court from ruling on defendant's motion for summary judgment on its counterclaim.

 Defendant has also attempted to show that plaintiff was not entitled to benefits under the NOE because he never properly notified his commanding officer of the injuries received, at the time they were

---

**23.** The record shows that the report of this "line of duty" investigation was signed by plaintiff's then commanding officer on September 23, 1979, who certified that ... "It is the opinion of the undersigned that the injury in question was incurred *in the line of duty and not as the result of subject man's own misconduct.*"

received, in accordance with SECNAVINST 1770.3 ¶ 6a. That paragraph states as follows:

"At the time of reporting for initial active duty for training or inactive-duty training (drill), all reservists *shall be instructed* to make a prompt report to their commanding officer of any injury or illness they incur during such period, and that failure to do so and/or to cooperate with medical and administrative officials may be the basis for denial of pay and allowances." [Emphasis added.]

Plaintiff argues, and we thoroughly agree, that the duty imposed by the quoted paragraph is on the commanding officer, "to instruct" rather than on the reservist "to report," in the first instance. In any case, the failure to report "may" be the basis for denial of benefits, but is not mandatorily so.

▉ Defendant claims that the monthly certifications by Naval authorities, to the effect that plaintiff was unfit for flying duty, were insufficient to justify continued payments under the NOE. In short, we believe that the discussion above clearly demonstrates, as plaintiff argues, that it is his lack of fitness to perform "his normal military duties" which is the criterion for his receipt of disability pay and allowances under a NOE, and not his condition under the generalized standard of fitness set forth in the DEM for disability retirement purposes. To the extent then that plaintiff was found unfit to perform his flight duties, and has been essentially kept in a "limbo" status since his grounding, his monthly certifications were sufficient to justify his entitlement to and receipt of disability benefits and the payment of those benefits was duly authorized.

Defendant has not presented any other substantive arguments challenging the validity of the NOE and the payment of benefits thereunder, and the court, having reviewed the record thoroughly on its own accord, therefore, concludes that it was val-

idly issued and the payments were validly made. In view of the above, the court determines that defendant is not entitled to prevail on its counterclaim.

▉ Finally, there remains for our consideration certain points discussed in defendant's brief-in-chief relative to the prayers for relief in plaintiff's petition. Defendant argues that this court does not have the power to grant the injunctive relief requested in plaintiff's petition, citing *Bilka v. United States,* 205 Ct.Cl. 879 (1974). While plaintiff's petition (originally filed *pro se*) may be somewhat inartfully drawn, we do not consider the prayer referred to, properly interpreted, as requesting injunctive relief, but rather for the payment of sums owed to plaintiff in the nature of back pay under particular provisions of law. Such a claim comes clearly within our jurisdiction and presents an appropriate occasion for reviewing the actions of a Correction Board under 28 U.S.C. § 1491. *Sanders v. United States,* 219 Ct.Cl. 285, 294–99, 594 F.2d 804, 809–12 (1979).[24]

Plaintiff has also asked for Aviation Career Incentive (flight) pay in addition to disability pay and allowances on his "relation-back" claim. However, we have determined that he is not entitled to disability benefits for that period and there is no claim that he did not receive proper drill pay during said period.

▉ Plaintiff also prays for retirement credit for federal service and the monetary value of certain other benefits such as commissary privileges. We agree with defendant that these claims may not be raised for the first time in this court since they were not raised administratively before the BCNR. *Doyle v. United States,* 220 Ct.Cl. 285, 311–12, 599 F.2d 984, 1000–01 (1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 837 (1980). Also, they appear to raise an issue of discrimina-

---

24. While this case was pending in the District Court for the District of Columbia, prior to its transfer to the former Court of Claims, *see* footnote 1, *supra,* plaintiff motioned for injunctive relief in the form of resumed disability pay

and allowances pending the outcome of that litigation on the ground of financial hardship. That motion was treated by the District Court as one for *injunctive relief and denied on* December 31, 1980.

tion between regulars and reservists, in violation of 10 U.S.C. § 277, but plaintiff has neither briefed nor argued the point and therefore we will not consider it. *Ulman v. United States,* 214 Ct.Cl. at 314, 558 F.2d at 4.

We also agree with defendant that plaintiff's claim for punitive damages cannot be adjudicated against the United States. *Leesona Corp. v. United States,* 220 Ct.Cl. 234, 252, 599 F.2d 958, 969 (1979), *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979); *Missouri Pac. Ry. Co. v. Ault,* 256 U.S. 554, 41 S.Ct. 593, 65 L.Ed. 1087 (1920). Finally, plaintiff must first comply with the provisions of the Equal Access to Justice Act, P.L. No. 96–481, 94 Stat. 2325–30, 28 U.S.C. § 2412, before this court can consider his claim to attorney's fees.

## CONCLUSION

In view of the above, we do not believe that plaintiff has carried his burden of proving that the decision of the BCNR, denying his request of October 3, 1980, to back date the effective date of his NOE to June 9, 1978, was illegal because it was arbitrary, capricious, without rational basis, unsupported by substantial evidence, and contrary to law. In affirming that portion of the BCNR's decision, we also grant defendant's motion for summary judgment and deny plaintiff's motion for summary judgment, with respect to the foregoing issue. On the other hand, plaintiff has clearly and convincingly carried his burden in establishing that the BCNR's decision denying his application of October 15, 1980, for the restoration of his disability pay and allowances under the NOE, was in fact unlawful and illegal in that it was arbitrary, capricious, without rational basis, unsupported by substantial evidence, and contrary to law and regulation.

At this posture, we deem it appropriate to emphasize that all that this court is de-

ciding on this issue is that in terminating plaintiff's disability pay and allowances as of June 30, 1980, the Navy simply failed to follow its own regulations. Plaintiff is, therefore, entitled to the claimed back pay, commencing as of July 1, 1980, in accordance with law. Accordingly, we order that such disability pay and allowances as plaintiff was receiving pursuant to the NOE issued on November 26, 1979, be reinstated effective July 1, 1980, and that plaintiff shall continue to be paid such disability pay and allowances until the same is properly terminated pursuant to applicable law and regulations. With respect to this issue, therefore, plaintiff's motion for summary judgment is granted and defendant's motion for summary judgment is denied.

Additionally, defendant's motion for summary judgment on the counterclaim is also denied.

Plaintiff is, therefore, entitled to recover in conformity with this opinion with the amount thereof to be reserved for determination through further proceedings pursuant to RUSCC 42(c).[25]

The parties shall have thirty-one (31) days from the date of this opinion in which to file a stipulation as to the amount of plaintiff's recovery consistent with the foregoing opinion. However, if the parties are unable to so stipulate, then further proceedings with respect to the amount of plaintiff's recovery are hereby set for July 11, 1983, at 10 a.m., at the National Courts Building, 717 Madison Place, N.W., Washington, D.C. 20005.

IT IS SO ORDERED.

---

**25.** This case was submitted for decision under the rules of our predecessor court, the United States Court of Claims, which, under Rule 131(c), provided for a separate determination of liability with further proceedings on the amount of recovery, if any. Our Rule 42(c) essentially parallels the old Rule 131(c).