Francis J. ULMAN, Receiver of Holiday Nursing Homes, Inc.

v.

The UNITED STATES.

No. 150–72.

United States Court of Claims.

June 15, 1977.

Richard H. Gens, Boston, Mass., attorney of record, for plaintiff.

Arlene Fine, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, Washington, D. C., for defendant. Howard G. Slavit, attorney of record, Washington, D. C.

Before NICHOLS, KUNZIG, and BEN-NETT, Judges.

BENNETT, Judge.

This case presents another claim of a provider of services under the Medicare Act, 42 U.S.C. § 1395 et seq. (1970), and regulations thereunder, 20 C.F.R. ch. III, part 405 (1967), for reimbursement of reasonable costs incurred in extending such services to patients insured by the Medicare program. Plaintiff is the duly appointed receiver in bankruptcy of Holiday Nursing Homes, Inc. (Holiday), a Massachusetts corporation which operated a business certified by the Department of Health, Education, and Welfare (HEW) as an "extended care facility" and a "provider of services" within the meaning of 42 U.S.C. § 1395x(j) and § 1395x(u), respectively. Holiday functioned in this capacity from January 5, 1967, when it designated Blue Cross Association to act as its fiscal intermediary [1] until October 1969. Throughout this time, Holiday received periodic payments from the intermediary for its reimbursable outlays, subject to later verification and retroactive adjustment of the total of the payments to reflect the provider's actual costs reasonably expended, as determined by the intermediary on audit of Holiday's annual cost reports. See 20 C.F.R. § 405.454 (1967).

During the first 5 months of 1967, representatives of Holiday and the intermediary on several occasions discussed the extent of the periodic payments to be made to the provider pending the first annual audit and

---

[1] The intermediary, nominated by the provider pursuant to 42 U.S.C. § 1395h (1970), is a public or private agency or organization charged, by agreement with the Secretary of HEW, with performing administrative functions for the Medicare program on behalf of the Secretary. Included in these functions is the determination and payment of the cost reimbursements due the provider, which determination is the final administrative ruling on the matter unless the provider prosecutes an appeal, as discussed *infra*. When Blue Cross was named Holiday's intermediary, it in turn designated its local plan organization, Massachusetts Blue Cross, Inc., to perform its functions with respect to Holiday, as permitted by article XIV of its agreement with the Secretary.

adjustment. The amount of such payments was denominated the "interim rate" of reimbursement. The interim rate was established some time after Holiday submitted its first interim cost report to the intermediary on January 25, 1967. It was revised when the second interim cost report was filed 2 months later. Thereafter, on May 18, 1967, the intermediary informed Holiday by letter that certain expenses theretofore included in the base amounts over which the rate was calculated—expenses relating to various committees and to the purchase of services from an outside contractor—would not be allowed for reimbursement. Upon final audit and adjustment of the 1967 reimbursable amount by the intermediary, a dispute arose over the propriety of the May 18 disallowance. Holiday contended that the failure of the intermediary's representative to object to the ultimately disallowed expenses at the times that its interim cost reports were filed and made the basis of the interim rates led Holiday to incur and keep incurring those expenses, thinking that they were reimbursable, and thus should preclude the intermediary from later changing its position and refusing to pay the expenses. Holiday appealed the intermediary's 1967 determination to the Blue Cross Association Provider Appeals Committee, though it did not similarly appeal the intermediary's determinations for 1968 and 1969, which were also initially in dispute.

The committee, after a hearing conducted in August 1969, sustained the intermediary's determination in February 1970. As a result of the committee's decision, coupled with the intermediary's determinations for 1968 and 1969, Holiday was found to have been overpaid by the interim payments, and to owe the Government, upon retroactive adjustment of the reimbursable amounts, a total of $179,970.30. Of this amount, $89,952, as stipulated, was attributable to 1967. Holiday then petitioned this court for review of the committee's ruling, as well as of the intermediary's 1968 and 1969 determinations. After the filing of the petition, George Goldstein was appointed receiver of Holiday, and upon motion he was substitut-

ed as the plaintiff. In an order styled *Goldstein v. United States*, 201 Ct.Cl. 888, *cert. denied*, 414 U.S. 974, 94 S.Ct. 287, 38 L.Ed.2d 217 (1973), this court granted defendant's motion to dismiss the petition with respect to 1968 and 1969 for the plaintiff's failure to exhaust administrative remedies by appealing to the Provider Appeals Committee. The order further stated that the court's review of the 1967 determination was limited, in light of 42 U.S.C. §§ 405(h) and 1395ff (1970), to ascertaining that the procedural and substantive aspects of the determination comported with the Constitution and the governing statute. *See Whitecliff, Inc. v. United States*, 536 F.2d 347, 210 Ct.Cl. 53 (1976), *cert. denied* (1977), 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361. The matter was remanded to the Trial Division for further proceedings on the allegation of detrimental reliance with regard to the disallowed costs, along with the additional claims that the composition and procedure of the Provider Appeals Committee deprived the provider of due process of law.

After a trial was scheduled in Boston, pursuant to the order of remand, the present plaintiff, who had been substituted as receiver of Holiday and as the complaining party here, and the Government agreed to a cancellation of the trial and a suspension of proceedings in this court in favor of going forward with a second full evidentiary hearing before the Provider Appeals Committee. This second panel, consisting of two members designated by the intermediary and a third representing the American Hospital Association, a provider organization, named by plaintiff as an "outside hearing officer" under the Blue Cross Association Medicare Provider Appeals Procedure (1968), convened on November 19, 1974. After a hearing the committee, in April 1975, upheld the intermediary's determination. Plaintiff then returned to this court with a motion for summary judgment filed February 19, 1976, seeking review of that committee's decision. Plaintiff again complains that the 1967 expenses relating to certain of Holiday's committees and to

**4**

an outside contractor were unfairly disallowed after the intermediary had lulled Holiday into believing that they would be reimbursed. He also continues the charge that the committee's composition violates due process, two of its members having been employed and designated by the intermediary and thus necessarily being partial to it, and adds the assertions that the *ex parte* role of an adviser to the committee (also an employee of the intermediary) and the committee's receipt of certain documentary evidence after the close of the hearing and absent the opportunity for live cross-examination of the declarants by plaintiff's counsel likewise deprived plaintiff of due process. The petition had also claimed a taking of plaintiff's property by defendant and asserted a claim for just compensation under the fifth amendment to the Constitution in the sum of $362,000 and for "damages" in the amount of $549,077. Defendant's answer denied the same. Plaintiff has not raised the taking and damage claim in his motion for summary judgment now before the court and we consider the same to be abandoned and dismiss the petition as to these allegations.

■ Defendant, in an amended answer, raises affirmative defenses as to our lack of jurisdiction (disposed of in *Goldstein v. United States, supra* ) or, alternatively, asks that the petition be dismissed for plaintiff's failure to exhaust his administrative remedies. Defendant counterclaims for overpayments to plaintiff in the sum of $175,701.17 for the years 1967–69, inclusive. The latter sum is the amount determined by the intermediary, as adjusted, to be refundable to the United States by plaintiff as a result of retroactive adjustments for said years.

We find no merit in plaintiff's contention that Holiday enjoyed a right to reimbursement on all the items of expense used in computing the interim rate until May of 1967. In the period of several months after the intermediary was appointed, there was considerable activity on the part of both Holiday and the intermediary to determine what the interim rate should be. The process of fixing the rate was necessarily an imprecise one, subject to estimation in the first instance and revision on various subsequent occasions in the course of working out a realistic projection of the reasonable, reimbursable portion of the actual costs. Estimation and later adjustment were at the heart of the first few months' activity, running counter to any notion of reasonable reliance on the intermediary's projections or seeming acquiescence in Holiday's. This is borne out by the language and tenor of the Medicare regulations, promulgated by HEW, in effect at the time. The regulation specifically in point, 20 C.F.R. § 405.454 (1967), entitled "Payments to providers," states in subsection (b) that "[w]hatever estimated cost basis is used for determining interim payments during the year, the intent is that the interim payments shall approximate actual costs as nearly as is practicable so that the retroactive adjustment [at the close of the fiscal year] based on actual costs will be as small as possible." To this end of tailoring the periodic payments so as to minimize the difference on final audit, subsection (c)(4) of the cited regulation provides—significantly for this case—that:

> After the initial interim rate has been set, the provider may at any time request, and be allowed, an appropriate increase in the computed rate, upon presentation of satisfactory evidence to the intermediary that costs have increased. Likewise, the intermediary may adjust the interim rate of payment if it has evidence that actual costs may fall significantly below the computed rate.

The quoted language, appearing in the subsection which according to its title deals solely with fixing the interim rate "during [the] initial reporting period," expressly anticipates and sanctions adjustment of the interim rate by the intermediary after the rate has been set and before the first annual audit occurs.

Central to plaintiff's theory that he has a right to be reimbursed for expenses at first included in the interim rate and then later removed from both the rate and the final amount paid (after retroactive adjustment) is the fallacy that the allowance of an item

of cost in the computation of the interim rate somehow vests the provider with a right to retain payment for it at year's end. The regulations contemplate no such right but, to the contrary, unambiguously reserve the effective determination of what is allowable and reimbursable at the time of final audit, when the retroactive adjustment—the only payment under the Medicare program in which the provider has a right to a specific amount—is calculated and announced. The regulations, 20 C.F.R. § 405.454(f) (1967), state:

(f) *Retroactive adjustment.* (1) Title XVIII of the Act provides that providers of services shall be paid amounts determined to be due, but not less often than monthly, *with necessary adjustments due to previously made overpayments or underpayments. Interim payments are made on the basis of estimated costs. Actual costs reimbursable to a provider cannot be determined until the cost reports are filed and costs are verified. Therefore, a retroactive adjustment will be made at the end of the reporting period* to bring the interim payments made to the provider during the period into agreement with the reimbursable amount payable to the provider for the services rendered to program beneficiaries during that period.

(2) In order to reimburse the provider as quickly as possible, an initial retroactive adjustment will be made as soon as the cost report is received. For this purpose, the costs will be accepted as reported—unless there are obvious errors or inconsistencies—subject to later audit. *When an audit is made and the final liability of the program is determined, a final adjustment will be made.*

(3) To determine the retroactive adjustment, the amount of the provider's total *allowable cost* apportioned to the program for the reporting year is computed. This *is the total amount of reimbursement the provider is due to receive* from the program and the beneficiaries for covered services rendered during the reporting period. The total of the interim payments made by the program in the reporting year and the deductibles and coinsurance amounts receivable from beneficiaries is computed. *The difference between the reimbursement due and the payments made is the amount of the retroactive adjustment.* [Emphasis supplied.]

If, then, the interim payments are only best estimates of reimbursable costs, are adjustable at any time to conform them more closely with the then-projected actual costs covered by the program, and are ultimately subject to revision at the time of the retroactive adjustment, there is simply no basis for plaintiff's assertion of detrimental reliance on the intermediary's seeming acquiescence in certain of Holiday's expense claims before May 18, 1967. Rather, in the circumstances here present, where both the Medicare program and the provider's participation in it were but barely under way when the disallowance of costs occurred, there was all the more reason for Holiday to have anticipated adjustments in its reimbursable amounts.

The strictures of section 405.454 noted above were presumably known to Holiday and were in any event binding upon it throughout the beginning months of 1967. They were also binding on the Government and its agent, the intermediary. No authority existed in the parties to vary the law as set forth in the regulations, in some fashion vesting in Holiday rights to money for costs allowed in computing interim payments. Neither the regulations nor the statute on which they are based permits such a disposition, and no party's promise or action to the contrary can make the Government liable in this action. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *Putnam Mills Corp. v. United States,* 479 F.2d 1334, 202 Ct.Cl. 1 (1973); *Montilla v. United States,* 457 F.2d 978, 198 Ct.Cl. 48 (1972). Plaintiff's claim for the costs disallowed in May 1967, on a detrimental reliance theory, must, therefore, fail. Assuming that there would be a stronger case for plaintiff had the intermediary actively solicited Holiday to incur the expenses in question though

the provider would not otherwise have incurred them, such is not this case, for here the intermediary only maintained its silence—for a short period, when it was analyzing the matter—while Holiday on its own initiative incurred the expenses and proposed their reimbursement. Plaintiff points to *Columbia Heights Nursing Home & Hosp., Inc. v. Weinberger*, 380 F.Supp. 1066 (M.D.La.1974), in support of his position, but it does not help him. An injunction issued in that case prohibiting a proposed retroactive adjustment that sought to revise the final amounts to be paid for four prior fiscal years (the first of which had already been subjected to final retroactive adjustment) in order to give effect to new accounting rules developed after the intermediary changed auditors. The case is clearly distinguishable from this one, for there the injury to the provider grew out of the great delay in making the final determination and the drastic change in well-established cost allocation procedures. Here, by contrast, the lapse of time between the submission of Holiday's first interim cost report and the announcement of the disallowance was relatively much shorter, about three and one-half months, and there was no well-established procedure to change. We conclude, therefore, that the complaint regarding the costs disallowed for reimbursement in May 1967 cannot stand.

■ Plaintiff next argues that there were fundamental defects in the proceeding before the Provider Appeals Committee that require us to vacate the committee's decision, in that to give it effect would deny plaintiff his right to procedural due process guaranteed by the fifth amendment. We set aside and do not reach the claim that the committee's admission into evidence of certain hearsay documents was an error in violation of due process, for the documents went solely to the facts of the disputed issue just disposed of above on the law, that is, whether representatives of the intermediary had acted in such a way as to lead Holiday to believe the costs eventually disallowed were intended to be covered by the program. We also will not discuss plaintiff's contention that the composition of the committee, with two of its three members being designated and employed by the intermediary, was so inherently biased that due process was necessarily denied plaintiff. The court's holding last month in a companion case, *Overlook Nursing Home, Inc. v. United States*, Ct.Cl., 556 F.2d 500 (1977), rejects a due process challenge identical to this one. We see no material difference in the facts between that case and this sufficient to warrant a contrary ruling here, and so we hold that plaintiff's contention is without merit.[2]

■ One remaining allegation of prejudicial procedural irregularity does require a brief discussion. Plaintiff asserts that the actions and influence of an employee of the

**2.** Plaintiff attempts to establish actual bias on the part of the committee's chairman, Chief Hearing Officer Gaynor, which if shown would distinguish this case from *Overlook*. However, the bias is said to be located only in the Chief Hearing Officer's decision to admit the above-mentioned hearsay documents into evidence, subject to plaintiff's right to counter the documents by affidavits and by submission of interrogatories to the declarants. As we have said before, the issue of the propriety of the documents' admission is no longer in this case, but to the extent that the decision to admit the documents may supposedly show bias, we note that nothing in the Chief Hearing Officer's conduct at the hearing, or in his correspondence with plaintiff's counsel made a part of the record, indicates in the least any actual bias on his part. No facts are cited to us that would suggest the Chief Hearing Officer took his actions with respect to the hearsay admission without the approval of the other committee members. Moreover, the good faith in his actions and his broad discretion in the conduct of hearings is evident in light of the provisions of the Social Security Administration's Provider Reimbursement Settlement and Hearing Procedures in effect during the 1974 hearing, appearing at pages 2–628, 2–632, 2–633, and elsewhere, as well as in light of 20 C.F.R. §§ 405.496, 405.499 (1974) and such decisions as *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Pascal v. United States*, 543 F.2d 1284, 211 Ct.Cl. 183 (1976); *West v. United States*, 207 Ct.Cl. 513 (1975); *Reil v. United States*, 456 F.2d 777, 780, 197 Ct.Cl. 542, 548 (1972); and *Morelli v. United States*, 177 Ct.Cl. 848 (1966). We find the allegation of actual bias unmeritorious.

intermediary present at the hearing, John Ruocco, served to deny him due process. Specifically, plaintiff says that Ruocco consulted—or, more precisely, should be presumed to have consulted—with the committee members after the close of the evidence, off the record, and prior to the rendering of the decision, thereby tainting the decision, we assume, because of some natural bias of his in favor of his employer. Plaintiff would have us infer that such consultation did occur from the fact that, at the hearing, the committee declined to grant plaintiff's request for a formal ruling that no committee member would consult with Ruocco after the close of the evidence. However, at the hearing, the committee chairman informed plaintiff's counsel that Ruocco had had no previous involvement in the intermediary's reimbursement decisions there in controversy, a fact which plaintiff did not counter at that time and which he does not now contest. Further, the chairman analogized Ruocco's role in the proceeding to that of a judge's law clerk. Ruocco had considerable expertise in Medicare reimbursement. Plaintiff has submitted no affidavits in support of his allegation of improper interference in the committee's deliberations, whereas defendant has furnished us with an affidavit from the chairman averring that "in this case, expertise of the members of the Panel made it unnecessary to seek Mr. Ruocco's counsel" and that Ruocco "was neither present at nor participated in the Hearing Officers' deliberations subsequent to the hearing."

It seems plaintiff's contention, not raised in this appeal until the filing of his reply brief, is little more than an attempt to buttress his argument for a general inference of bias with some example of actual bias, lest his hoped-for general inference be rejected by the court, as we do reject it. But, this supposed instance of actual bias itself requires an inference to be believed, an inference not supported on plaintiff's part by specifics set out in affidavits, though countered by defendant's affidavit. Moreover, for all that is shown on the record before us, any bias in the intermediary's favor appears to be the same for Ruocco as for the intermediary-designated committee members, though the taint on the proceeding brought about by such supposed bias has been rejected as to the latter. We conclude from all this that plaintiff has not shown or offered to show enough on this point, nor sufficiently countered defendant's affidavit with his general assertions and requests for inferences, to prevail against the Government's cross-motion for summary judgment. Ct.Cl. Rule 101(f); *Pacific Far East Line, Inc. v. United States,* 513 F.2d 1355, 1359, 206 Ct.Cl. 378, 385 (1975). We hold that Ruocco's role in the administrative proceeding did not deny plaintiff due process.

As we noted earlier, defendant has counterclaimed for the amounts of the retroactive adjustments said to be due it for 1967, 1968, and 1969. Plaintiff's last argument in this case is that he should be accorded the opportunity to defend against the 1968 and 1969 portions of the counterclaim on the merits, rather than having the counterclaim decided now by summary judgment in defendant's favor due to Holiday's failure to appeal administratively the intermediary's determinations for those years. Plaintiff acknowledges that the order in *Goldstein v. United States, supra,* foreclosed him from challenging the 1968 and 1969 determinations in this court directly, as he has challenged the 1967 determination, because administrative appeals had not been exhausted with respect to the two later years. However, he says that the situation is different for his defense against a counterclaim. We do not think that the proffered distinction is valid.

The *Goldstein* order held that appeal to the Provider Appeals Committee was "mandatory" in seeking review of the intermediary's determination and that the "provider could not properly by-pass this administrative procedure." Where an administrative appeal is compulsory prior to invoking the aid of a court, it does not matter that the party who failed to pursue such appeal is petitioning the court for relief or defending an action brought against him. In either situation, the failure to pur-

sue the prescribed administrative course effectively prohibits him from raising in court the merits of his claim or defense which could have been entertained administratively in the first instance. *United States v. Ruzicka,* 329 U.S. 287, 67 S.Ct. 207, 91 L.Ed. 290 (1946); *United States v. White,* No. CV 75–364–EC (C.D.Cal., Jan. 12, 1976); *cf. Smith v. United States,* 199 F.2d 377 (1st Cir. 1952). Defendant seems to be correct that all plaintiff is doing, in raising this point, is attempting to reopen the issue of whether the administrative appeal procedure in Holiday's case was mandatory, a matter settled by the *Goldstein* order and now the law of the case. Denying plaintiff the opportunity to address the merits of the counterclaim for 1968 and 1969 cannot very well be characterized as an unfair surprise to plaintiff, for in failing to challenge in administrative appeals the 1968 and 1969 determinations by the intermediary that Holiday owed refunds to the Government, the provider acquiesced in what it knew to be the claims of the Government. Were we to allow plaintiff's defense on the merits, after the opportunity for administrative review had come and gone, we would be saying that the "provider could * * * properly by-pass this administrative procedure," which would be contrary to *Goldstein* and which we decline to say. We hold, then, that plaintiff may not assert in this proceeding his claims that the 1968 and 1969 determinations of the intermediary were contrary to statute and regulations, and we further hold that, absent any proper challenges to its counterclaim on the facts or the law, defendant is entitled to summary judgment in its favor on the counterclaim for 1968 and 1969.

In view of our disposition of plaintiff's challenge to the committee's decision regarding the 1967 claim, no material facts remain in dispute over that claim. Our discussion above leads us to sustain the committee's ruling, entitling defendant to summary judgment on its counterclaim for 1967. We conclude, therefore, that plaintiff's motion for summary judgment must be and it is denied, defendant's cross-motion for summary judgment is granted, judg-

ment is entered in defendant's favor on its counterclaim, as amended, in the amount of $175,701.17, and the petition is dismissed.