**BAYOU LAND & MARINE CONTRACTORS, INC.,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 583–87C.

United States Claims Court.

Aug. 8, 1991.

Michael J. Moran, Metairie, La., for plaintiff.

Joan M. Bernott, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

NETTESHEIM, Judge.

The issues to be decided on cross-motions for summary judgment are twofold. The first is whether the parties' contract apprised a reasonably prudent contractor that marine divers would be required in the placement of pier timber bracings in the Mississippi River to repair a wharf deck at a small Navy boat landing. The second is, assuming that the contract was ambiguous, whether the ambiguity was patent or latent. The case was reassigned to this judge after argument had been held.

## FACTS

The following facts are undisputed. Bayou Land and Marine Contractors, Inc. ("plaintiff"), a Louisiana corporation, was awarded Contract No. N62467–84–C–7219 by the Department of the Navy, Naval Facilities Engineering Command ("NAVFAC"), on December 14, 1984. Plaintiff was to repair the wharf deck at the small boat landing at the Naval Support Activity on the Mississippi River in New Orleans, Louisiana. The project included:

demolition and removal of railroad trackage, timber deck, stringers, bracing and pile caps and some timber piling; installation of new timber piling, reinstallation of new structural timber pile caps, stringers and diagonal bracing and installation of new precast concrete deck. Furnish and install new walkway cover and waiting room and other miscellaneous work.

Before award of the contract to plaintiff, NAVFAC amended the bid specifications three times. The first amendment added an Attached Wage Determination Decision of the Secretary of Labor, which established minimum wage rates and other labor standards. The second amendment postponed the opening of bids from 2:00 p.m. September 7, 1984, to 2:00 p.m. September 18, 1984. The third amendment again postponed the opening of bids until 2:00 p.m. September 20, 1984, and also established a new requirement that the construction be phased so that Naval Support Activity personnel could have continuous use of the small boat landing, boathouse, and walkway during construction. Contract Drawing No. 5083271 designated "work area" by an arrow pointing to a peninsula-shaped protuberance into an area designated "Mississippi."

On January 13, 1986, Michael J. Thompson, plaintiff's Vice–President, dispatched a letter to the Resident Officer in Charge of Construction ("the ROICC") stating that his company understood from the drawings that plaintiff was not required to paint the walkway and building steel framework, which need be galvanized only. The ROICC, however, instructed plaintiff to paint the galvanized framework royal blue. Plaintiff painted the framework as instructed. On September 30, 1986, plaintiff submitted a claim to the ROICC for $4,791.44 for painting the steel framework of the covered walkway and the waiting area building. On January 27, 1987, the contracting officer issued Final Decision 87–S–5 denying compensation. In denying plaintiff's claim, the contracting officer referred to Contract Modification P00003, which, as negotiated and signed by an official of plaintiff's organization, as well as by NAVFAC, provides for an increase of

$3,154.00 in the contract amount and authorizes a 75–day time extension. Item C of this modification stipulates that plaintiff "[p]aint galvanized steel walkway supports." The contracting officer reasoned, therefore, that Contract Modification P00003, Item C specifically includes painting the walkway supports. Although the complaint includes a claim for this item, plaintiff did not move for summary judgment with respect to the necessity of painting the walkway and steel building framework. Therefore, this claim is deemed abandoned. *Sheets v. United States,* 2 Cl. Ct. 101, 102 n. 2 (1983) (citing *Webco Lumber, Inc. v. United States,* 230 Ct.Cl. 457, 465, 677 F.2d 860, 864 (1982); *Ullman v. United States,* 214 Ct.Cl. 308, 314, 558 F.2d 1, 4 (1977)).

The dispute that is the focus of the parties' attention on summary judgment is whether the contractor was required to provide marine divers for repair work. NAVFAC Drawing No. 5083274 specified that $4 \times 10$ foot timber bracing be installed 18 feet below the concrete wharf deck planks which, according to plaintiff, converts to a river level of one to two feet below the river's "zero feet" water level.[1] NAVFAC Drawing No. 5083274 includes no water level indication. Other drawings, however, do include water level references. NAVFAC Drawing No. 5083275 depicts a water level indication specifically labeled "LOW W.L.", or low water level, on a section of the drawing labeled "ELEVATION FENCE CLOSURE." The drawing also indicates the "MUD LINE" below the low water level. NAVFAC Drawing No. 5083272 depicts two water level indications with architectural symbols and no labels. One of these indications is an architect's sectional view from the river depicting the completed wharf project, including the ex-isting small boat administration building and covered waiting area. The other indication, located on a different section of Drawing No. 5083272, is an architect's sectional view looking west at the small boat landing depicting the new covered waiting area and the covered walkway. Neither of these last two water level indications contains any reference to a mean sea level elevation, the concrete decking, or any other portion of the wharf construction. Drawing No. 5083272 also gives mud line indications with architectural symbols.

Plaintiff interpreted the drawings and specifications to require that marine divers would not be needed to complete any of the repair work; therefore, plaintiff's bid submittal contemplated neither the use nor cost of divers to perform the repair work. The bid specifications did not specify that divers or divers' insurance was required, nor did the minimum wage rates and other labor standards of Amendment 00001 list wages for divers. Wages for many other laborer positions required to complete the repair work, however, were listed. Plaintiff's insurance carrier stated in a letter dated August 4, 1986, that any employees working in the river waters would not be covered by plaintiff's then-current policy.[2]

The high-low water levels of the river vary approximately 16 feet during any season. According to H.J. Hinrichs, Chief Engineer for the Port of New Orleans, the low water level season usually occurs during August and September. The repair work was originally scheduled to be completed by June 27, 1985. High water levels, however, postponed the completion date because general pile driving operations could not be performed.

Mr. Thompson's letter dated September 16, 1985, to Ens. W.T. Cole, Assistant to

---

**1.** This zero feet water level, relative to mean sea level, is derived from records compiled by the Carrollton Gauge Observation Station near the Naval Support Activity area. For construction purposes, it is often important to relate any proposed structure or relative water level to m.s.l. as a means of providing an approximation of the height of that structure or water level relative to the seasonal high and low water levels within the Mississippi River.

**2.** Plaintiff's insurance carrier elucidated: "While we do provide coverage for incidental exposure while your men are working on board non-powered barges and small work boats, there is no coverage for those employees should they put on wet suits and begin working in the water. At this time, they would be classified as divers, and the exposure for divers is specifically excluded under your policies."

the ROICC, stated that in order to place the lower bracing 18 feet below the top of the concrete decking the river would have to be at a level of −1 to −2 feet on the Carrollton gauge. He wrote that at present the river no longer fell below zero and that diving work might be required, due presumably to the seasonal ebb and flow of the river. Enclosed with the letter were eleven annual hydrographs from the Carrollton observation gauge near the Naval Activity area charting the river water elevation, which show that the river did not fall below zero feet during the years from 1973 to 1983. At this time Mr. Thompson expressed his expectation that divers would be required to place the lowest timber bracing underwater. Mr. Thompson proposed to remedy the problem by installing a double $4 \times 10$ foot horizontal bracing at the lowest accessible point then available at the present river elevation.

On September 19, 1985, Milton L. Gagnon, plaintiff's President, wrote a letter to Ed Burns, Assistant to the ROICC, requesting that plaintiff be allowed to place the bracing as close as possible to the specified location on the drawing with the present river elevation of +3.4 on the Carrollton gauge. On August 6, 1986, Mr. Thompson sent a letter to Mr. Burns referring to their July 16, 1986 meeting. Mr. Thompson stated that only the installation of the lower horizontal timber bracing remained to be accomplished and that plaintiff did not foresee the river's falling to an elevation that would allow the lower bracing to be installed without divers. Mr. Thompson also stated that one diving company could perform the installation of the braces for $15,000.00—this amount being the lowest of five bids. Mr. Thompson related that the Chief Engineer of the Port of New Orleans confirmed that common practice in repairing wharfs is to install bracing when the river is at the lowest possible elevation. Finally, Mr. Thompson requested a change order to cover the additional amount required to hire divers to place the lowest horizontal timber bracing. This request was denied, and plaintiff hired Deep Six Diving & Salvage Co. to assist in placing the lower horizontal timber bracing. The invoice from the diving company totals $15,000.00 and is dated September 26, 1986.

On September 30, 1986, plaintiff submitted a claim to the ROICC for $18,180.00 to cover the costs of employing divers to install the horizontal timber bracing, bond fee, overhead, and profit. Plaintiff stated in its claim that it notified the ROICC in September 1985 about the problem of installing the lower timber bracing and at that time could have raised the diagonal bracing to allow the horizontal timber bracing to be placed without the use of divers. Plaintiff's claim letter related that during September 1985[3] a meeting took place between plaintiff, the consulting engineer, and the ROICC to discuss alternate solutions that would not require the use of divers. At this meeting the ROICC instructed plaintiff to install the bracing as shown on the drawings. Plaintiff maintained its position that divers were contemplated neither by itself nor NAVFAC and that divers were not included in the Wage Determination of Amendment 00003 to the bid specifications. Plaintiff also stated that it was common practice in the area to install bracing without the use of divers and that its insurance did not cover any employees working in the river waters. Finally, plaintiff stated that its request for a change order was denied on August 20, 1986.

In a final decision dated January 27, 1987, the contracting officer again denied plaintiff's claim. The contracting officer reasoned that NAVFAC's drawings showed the lower horizontal timber bracing to be 18 feet below the concrete decking and the existing river water level to be well above the location at which this bracing would be placed. The contracting officer suggested that the contract documents and a site inspection at the time of the contract signing indicated the construction conditions:

> [T]he conditions which affected the performance of the work were indicated in the contract documents and were evident

---

3. The correspondence indicates that the meeting took place in August.

at the site at the time of execution of this contract. You are responsible for determining the method and procedure for accomplishing the scope of work and the cost of this should have been included in your original price for performing the scope of work for this contract. Therefore, the expense of performing the work was your prerogative and as such does not entitle you to additional compensation.

After the contracting officer denied the claim, plaintiff filed suit in the Claims Court on September 18, 1987.

Plaintiff asserts several grounds for recovery. Plaintiff contends that nothing in the bid specifications or drawings indicates that the wharf repair could not be completed without the use of divers. Additionally, plaintiff argues that none of the drawings depicts mean sea level elevations and that the contracting officer should have exercised his discretion to delay the completion of the project until the next low water season. Plaintiff contends further that the bid specifications contain a latent ambiguity and asserts that such ambiguity consequently should be construed against NAVFAC as the drafter of the specifications. Finally, plaintiff relies on an affidavit of its Vice–President, Mr. Thompson, who averred that his pre-bid inspection revealed the lower bracing to be exposed above the water line and accessible for replacement without the use of divers. Mr. Thompson also averred that he returned to the job site after completion of the wharf repair and again saw the lower bracing above the water line. These inspections, argues plaintiff, justified and reinforced its interpretation of the bid plans and specifications that marine divers would not be required to complete the job. Thus, plaintiff asserts that its interpretation was reasonable.

Defendant maintains that if the bid plans and specifications do contain an ambiguity, it is patent. As such, plaintiff must be held accountable for not attempting to clarify any patently ambiguous contractual provisions. Defendant also asserts that plaintiff's motion for summary judgment and plaintiff's response to its cross-motion are defective because certain factual allegations were not identified as "uncontroverted facts" and therefore should not be considered by the Claims Court in ruling on the cross-motions for summary judgment.

## DISCUSSION

### 1. *Summary judgment standards*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. *Id.* Both plaintiff and defendant, as the moving parties, have the burden of establishing that there are no genuine material issues in dispute and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In the capacity of opposing each other's motion, plaintiff and defendant have the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Celotex*, 477 U.S. at 322, 324, 106 S.Ct. at 2552, 2553.

> To create a genuine issue of fact, the non-movant must do more than present *some* evidence on an issue it asserts is disputed. The Court stated:
>
> > [T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence [of the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted.

*Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed.Cir. 1988) (emphasis in original) (quoting

*Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted), and citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)).

In resolving the cross-motions, the court cannot weigh the evidence and determine the truth of the matter on summary judgment. *Anderson,* 477 U.S. at 249, 255, 106 S.Ct. at 2510, 2513. Any evidence presented by the opponent is to be believed and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513. Uncontested material facts also have been found consistent with the rule that, in respect of any facts that may be considered as contested, each party, in its capacity as the opponent of summary judgment, is entitled to "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

Summary judgment pursuant to RUSCC 56 properly can intercede and prevent trial if the movant can demonstrate that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut but, rather, as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action. . . .'" *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoted in *Avia Group Int'l,* 853 F.2d at 1560, and *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987)).

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior

> to trial, that the claims and defenses have no factual basis.

*Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555; *see also Universal Life Church, Inc. v. United States,* 13 Cl.Ct. 567, 580 (1987) (citing cases), *aff'd,* 862 F.2d 321 (Fed.Cir. 1988) (Table). A trial court may deny summary judgment, however, if "there is reason to believe that the better course would be to proceed to trial." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513 (citation omitted).

Plaintiff's motion for summary judgment is defective in that certain issues of fact averred by Mr. Thompson were not included in its statement of proposed findings of uncontroverted fact as required by RUSCC 56(d)(1). These putative facts include the following: that Mr. Thompson saw the lower horizontal bracing exposed on his pre-bid site inspection; that Mr. Thompson saw the same bracing exposed after the construction was completed; and that common practice in the area is to replace lower timber bracing by waiting for the low water season. Nor did plaintiff respond to defendant's cross-motion with a statement of genuine issues as required by RUSCC 56(d)(2). In response to an order of a prior judge to respond to defendant's 14 proposed findings of uncontroverted fact plaintiff only resubmitted a copy of its original statement of proposed findings of uncontroverted fact.

RUSCC 56(c), like Fed.R.Civ.P. 56(c), provides:

> **Motion and Proceedings Thereon.** The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Fed.R.Civ.P. 56 contemplates that the federal districts adopt rules of practice to implement the requirements of Rule 56.

RUSCC 56(d) is in the nature of a local rule of federal practice, as it stipulates the procedures by which a party establishes its entitlement to summary judgment or puts forth a genuine issue to be tried. RUSCC 56(d)(1) and (2) provide:

(1) The moving or cross-moving party shall file, together with its motion, a separate document entitled Proposed Findings of Uncontroverted Fact. This document shall contain concise, separately numbered paragraphs setting forth all of the material facts upon which the party bases its motion and as to which the party believes there is no genuine dispute. Each paragraph shall contain citations to the opposing party's pleadings or to documentary evidence, such as affidavits or exhibits, filed with the motion or otherwise part of the record in the case.

(2) The opposing party shall file, together with its opposition or cross-motion, a separate document entitled Statement of Genuine Issues. This document shall respond by reference to specific paragraph numbers to those proposed findings of uncontroverted fact as to which it claims there is a genuine dispute. The party shall state the precise nature of its disagreement and give its version of the events, supported by record citations. The opposing party may also file proposed findings of uncontroverted fact as to any relevant matters not covered by the moving party's statement.

Rule 56(d)(3) provides, in pertinent part:

In determining any motion for summary judgment, the court will, absent persuasive reason to the contrary, deem the material facts claimed and adequately supported by the moving party to be established, except to the extent that such material facts are included in the Statement of Genuine Issues and are controverted by affidavit of other written or oral evidence.

See *Boehm v. United States*, 22 Cl.Ct. 511, 575 (1991). Defendant contends that plaintiff cannot prevail on its motion for summary judgment because it failed to include material facts in its proposed findings of uncontroverted fact. As a consequence, defendant reasons, defendant was neither in a position, nor was required, to controvert them.

No precedent interpreting Fed.R.Civ.P. 56 holds that a statement of uncontroverted fact is a prerequisite for summary judgment. However, the Federal Circuit has set forth the obligation of a party opposing summary judgment to create a genuine issue of material fact: "The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient." *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984). Moreover, no precedent exists that the failure to file a statement of genuine issues precludes a party from relying on an affidavit. *Cf. deRochemont v. United States*, 23 Cl.Ct. 80, 83 (1991) (accepting defendant's proposed findings as undisputed to the extent that they did not conflict with allegations of the complaint when plaintiff failed to respond to defendant's motion for summary judgment).

This court concludes that the conjunctive requirements established by RUSCC 56(c) and (d) should control: The proponent of summary judgment must submit both proposed findings of uncontroverted fact pursuant to Rule 56(d)(1) and an affidavit or other type of evidence or material specified in Rule 56(c). Likewise, the opponent of summary judgment must submit both a statement of genuine issues pursuant to Rule 56(d)(2) and an affidavit or other evidence or Rule 56(c) material in support of the motion. Were the rules not enforced, the Claims Court in a typical summary judgment motion would be required to sift through hundreds of pages of appendices to the complaint and briefs to ferret out the one material fact that either would support or inhibit summary judgment. A mind-numbing review would be mandated in every case to assure that no such dispositive factual issue lurked in the parties' submissions. The burden would be

insupportable.[4] The practical solution envisioned by RUSCC 56(d)(1) and (2) is to charge the proponent and opponent to list every fact—uncontroverted or in controversy, as the case may be—and to cite to the affidavits or exhibits or other record material that support each point.

The court retains discretion, however, to consider a party's submissions even though they do not comply with RUSCC 56(d)(1) and (2) when the movant's (both plaintiff's and defendant's, in the case of a cross-moving party) proposed findings of fact are short and the other submissions and relevant pleadings are few and not lengthy. In this case the six-page complaint contained nine exhibits totalling 70 pages. No discovery responses were on file. Plaintiff submitted six proposed findings; defendant, 14. The parties' statements of genuine issues served only to agree with the movant's proposed findings and did not add any factual issues. Attached to plaintiff's motion for summary judgment was a 17–page appendix of seven exhibits, including Mr. Johnson's affidavit. Defendant's opposition and cross-motion attached exhibits totalling ten pages. This court exercises its discretion to consider the additional facts in Mr. Johnson's affidavit, with the admonition that failure to comply with Rule 56(d)(1) and (2) can, and should be, fatal in all but the exceptional case.

### 2. Contract interpretation

The court's first duty in construing disputed contractual provisions is to " 'ascertain analytically whether *vel non* an ambiguity existed' " in the drawings and specifications. *John C. Grimberg Co., Inc. v. United States*, 7 Cl.Ct. 452, 456 (1985) (quoting *Enrico Roman, Inc. v. United States*, 2 Cl.Ct. 104, 106 (1983)), *aff'd mem.* (Fed.Cir.1985) (unpubl.). Matters of pure contract interpretation—including specifications, plans and drawings—fall within the court's purview for resolution. *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984). "The question of interpretation of language and conduct—the question of what is the meaning that should be given by a court to the words of a contract, is a question of fact, not a question of law." *Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1183 (Fed.Cir.1988). An interpretation giving rise to reasonable meaning to all parts of a contract will be endorsed over one that leaves portions of the contract meaningless. *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed. Cir.1985) (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir.1983)). Established court precedent and rules of construction require that contract provisions should not be interpreted as conflicting with one another unless there is no other reasonable construction of the language possible. *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965). However, a contract is ambiguous if it is susceptible of two different interpretations, each of which is found to be consistent with the contract's language. *Sun Shipbuilding & Dry Dock Co. v. United States*, 183 Ct.Cl. 358, 372, 393 F.2d 807, 815–16 (1968).

It is a fundamental precept of common law that the intention of the parties to a contract control its interpretation. *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). The avowed purpose and primary function of the court is the ascertainment of the intent of the parties to a contract. *Beta Systems*, 838 F.2d at 1185 (citing S. Williston, *A Treatise on the Law of Contracts* § 601 (3d ed. 1961)). The ordinary meaning of the contract's language governs, *American Science & Engr'g Co. v. United*

---

4. For example, assume that the proponent of summary judgment makes its submissions according to rule, and the opponent submits appendix material, but no statement of uncontroverted fact. The court's apparent task would be to review not only the opponent's uncharted appendix, but all of proponent's appendices, as well as the complaint, and any discovery responses on file (which may have been submitted with a prior motion for protective order, for example), to rule out the existence of a genuine issue of material fact. If the opponent also cross-moved without proposed findings, the same exercise would have the dual objective of also ascertaining if summary judgment could be granted on the cross-motion.

*States*, 229 Ct.Cl. 47, 57, 663 F.2d 82, 88 (1981), and a party's subjective, unexpressed intent plays no role in interpreting a contract. *See ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 752, 524 F.2d 680, 684 (1975) (citing cases).

Plaintiff notes that upon Mr. Thompson's original visit to the contemplated construction site on September 11, 1984, immediately prior to plaintiff's submission of its bid, the original lower bracing (ultimately replaced by plaintiff) was clearly visible and above the water line and therefore available for removal and repair at the time of this inspection. Mr. Thompson averred that in July 1988 he returned to the job site at the request of his counsel to inspect the site again and found the lower bracing well out of the water. Plaintiff asserts that an ambiguity exists in that the plans, specifications, and drawings did not truly indicate any mean sea level locations of the wharf decking, upper bracing, and lower bracing and that, as a result of this omission, NAVFAC failed to put prospective bidders on notice of any need to use divers in gaining access to the lower bracing area. The surrounding circumstances, however, belie that assertion.

Even with the absence of any explicit reference to a requirement for marine divers, the drawings showing that the lowest struts were to be placed under a level indicated low water level support an interpretation that the contract showed below-water-level location of the bracing. Moreover, the drawings specify in three places below-water-level placement of the lower timber bracing and in four places above-mud-line placement.[5] A contractor could not reasonably infer that the water level designations in the contract drawings necessarily represented high water marks. The contract drawings' depictions of the underwater situs of the lower timber bracings render this contract unambiguous on the point in issue.

Acknowledging that the drawings do not indicate mean sea level, defendant points out that designations of mean sea level would have indicated exactly what the drawings already illustrate. The court agrees. Plaintiff points to the absence of any wage scale classification for marine divers to support its contention that there was a latent ambiguity. Defendant responds that the Invitation for Bids indicated that wage rates may be added by amendment. Moreover, plaintiff submitted a July 24, 1986 letter from H.J. Hinrichs, Chief Engineer, Port of New Orleans, indicating that underwater construction can sometimes proceed without the use of marine divers.[6]

Plaintiff's arguments do not detract from the plain meaning of the contract. Since the contract drawings call for a different performance than that which the contractor wished to provide, NAVFAC was entitled to insist on the contractually prescribed performance.

### 3. *Patent Ambiguity*

Assuming, *arguendo*, that an ambiguity exists, it should be deemed patent, not la-

5. The drawings indicate river water level by an architectural symbol, several sets of broken lines beneath a long unbroken line, at approximately three-fourths distance up the height of the lower timber bracings marked "new construction" in the upper left-hand corner of NAVFAC Drawing No. 5083272. The contract again refers to river water by the same architectural symbol in the upper center of the same drawing. The contract indicates low water level ("LOW W.L.") about midway up the height of the fence closure elevation in the upper center of Drawing No. 5083275.

The drawings mention the mud line in four places. River floor and "MUD LINE" are indicated by cross-etchings below an uneven line in the illustration that appears on the center left of Drawing 5083272. The architectural symbol—again representing a mud line—is shown falling off precipitously below the outer edge of the wharf in the upper center of the same drawing. The same symbol, denoted by "MUD LINE (TYPICAL)," appears in the upper center illustration on Drawing No. 5083274. Finally, the mud line architectural symbol appears in the upper center illustration of the ELEVATION FENCE CLOSURE in Drawing No. 5083275, accompanied by the designation "MUD LINE."

6. The letter stated, "There have been occasions when low bracing has been installed using pile drivermen in the water with pneumatic tools installing braces under water, at times using wet suits but no supplied air."

tent. It is possible by a strained reading to discern an ambiguity in this case. The contract solicitation, specifications, and drawings failed to denote a wage scale for divers, although including other trades contemplated as necessary for the completion of the work; nor was divers' insurance listed as required. NAVFAC Drawing No. 5083275 contains a section labeled "ELEVATION FENCE CLOSURE," which has a water level indicated specifically as "LOW W.L." that lies above at least one bracing. This drawing, however, does not provide any absolute reference by which to gauge the anticipated level of the river relative to the depth of the timber bracing.

■ Once an ambiguity is found to exist, the issue becomes whether the disputed provisions were patently ambiguous at the time of contracting. If they were, a duty then arises on the non-drafting party to inquire as to their meaning. *Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed.Cir.1988). Thus, if differing constructions of the contract's plain meaning are plausible, the court must inquire whether such discrepancies would be apparent to a reasonably prudent contractor. *John G. Grimberg Co.*, 7 Cl.Ct. at 456. Reasonableness is the standard. Contractors must inquire only as to major discrepancies, obvious omissions, or manifest conflicts in contract provisions. *WPC Enter., Inc. v. United States*, 163 Ct.Cl. 1, 6, 323 F.2d 874, 877 (1963). As the Court of Claims stated in *Wickham Contracting Co., Inc. v. United States*, 212 Ct.Cl. 318, 323–24, 546 F.2d 395, 398 (1976):

> Under circumstances where a patent and glaring discrepancy exists in a contract drawing, and such a discrepancy would be recognized by a reasonable bidder, there is a burden imposed on such a bidder to seek clarification ... before submitting a bid, if the bidder, subsequent to an award to it, hopes to rely on its unilateral resolution of the discrepancy issue as a basis for a subsequent contract price adjustment claim. *Merando, Inc. v. United States*, 201 Ct.Cl. 23, 475 F.2d 601 (1973); *Space Corp. v. United States*, 200 Ct.Cl. 1, 5–6, 470 F.2d

536, 539 (1972); *Beacon Constr. Co. v. United States*, 161 Ct.Cl. 1, 7, 314 F.2d 501, 504 (1963)....

The standard for determining a patent ambiguity is calibrated, but not precisely. To be denominated a patent ambiguity, the ambiguity must unequivocally be " '*so* glaring as to raise a duty to inquire.' " *Fort Vancouver Plywood Co.*, 860 F.2d at 414 (quoting *United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed.Cir.1987) (emphasis in original)). When resolving whether a contract is patently ambiguous, "the language must be placed at a point along a spectrum of ambiguity...." *Fort Vancouver Plywood Co.*, 860 F.2d at 414 (citation omitted).

■ It is not the contractor's actual knowledge, but the obviousness of the inconsistency that imposes the duty to inquire. *Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 515, 455 F.2d 1037, 1045 (1972). "This proposition is for application in situations where a bidder knew, as well as in situations where a bidder should have known, of the discrepancy...." *Wickham*, 212 Ct.Cl. at 324, 546 F.2d at 398. A contractor's failure to comprehend an obvious ambiguity in no way excuses its affirmative duty of inquiry. *Carothers Constr. Co., v. United States*, 20 Cl.Ct. 556, 560 (1990) (citing *J.A. Jones Constr. Co. v. United States*, 184 Ct.Cl. 1, 395 F.2d 783 (1968)).

■ Significant policy considerations undergird the policy of imposing a duty of inquiry on a contractor when the discrepancy is sufficiently obvious. In particular, it encourages clarification of ambiguities or correction of errors before the contract award and thereby avoids the need for expensive and complex litigation during contract administration. *Monarch Painting Corp. v. United States*, 16 Cl.Ct. 280, 287 (1989) (citing *Beacon Constr. Co. v. United States*, 161 Ct.Cl. 1, 6–7, 314 F.2d 501, 504 (1963)).

The pre-award clarification requirement bolsters the competitive bidding system. The duty to inquire prevents one contractor from exploiting ambiguity in the contract so as to bid only on a portion of the

work solicited and thereby appear to be the low bidder. Requiring disclosure of ambiguous provisions or constructions of the contract before bidding ensures that all contractors bid on the basis of identical specifications. *Monarch Painting*, 16 Cl.Ct. at 287. In short, the contractor ordinarily bears the burden of inquiry in order that all parties may avoid complex and costly litigation. The principle of patent ambiguity deters a "bidder, who knows (or should know) of a serious problem in interpretation, from consciously taking the award with a lower bid ... with the expectation that he will then be able to cry 'change' or 'extra' if the procuring officials...." disagree with the contractor's interpretation. *S.O.G. of Arkansas v. United States*, 212 Ct.Cl. 125, 131, 546 F.2d 367, 371 (1976).

In this case, the fact that NAVFAC Drawing No. 5083275 contains a reference, "LOW W.L.," should have caused plaintiff to question whether the lower bracing would be accessible for removal and replacement without the use of divers. Plaintiff asserts that it believed that the water level indication on NAVFAC Drawing Nos. 5083272 and 5083275 represented a "high water level" because Mr. Thompson, during his site inspection, had seen the river at a lower water level than depicted in the drawings. The Mississippi River varies in water elevation approximately 16 feet seasonally, according to Mr. Thompson's affidavit. If the river varies 16 feet, a reasonably prudent contractor would be concerned whether the lower timber bracing might not be accessible for replacement. If there were no indication of water elevation given in any of the drawings, then the ambiguity might be latent. Here, however, one drawing, No. 5083275, explicitly identifies a low water line. The existence of this one document alone raises the question of whether any of the required work would be performed underwater and thus require the services of divers. If plaintiff had noted the distance shown on NAVFAC Drawing No. 5083275 between the concrete decking and the low water line, it would have found the low water line to be approximately eleven feet below the concrete decking. Given the 16-foot fluctuation in river elevation, a reasonably prudent contractor might have believed that the low water line indication was misleading, thereby giving rise to an affirmative duty to inquire further. This drawing's low water level indication should have prompted plaintiff to seek assurance that all of the timber bracing could be replaced without using divers.

Plaintiff asserts that the contracting officer has at his discretion the ability to extend the completion date of a construction contract and that the failure of the contracting officer to do so in this case "represents a change order for work not contemplated by the original contract terms and conditions." Plf's Br. filed Jan. 30, 1990, at 8.[7] While it is true that a contracting officer can grant an extension, such a determination is discretionary. Plaintiff and defendant entered into this contract on December 14, 1984, with a scheduled completion date of June 27, 1985. The contract completion date had already been postponed because high river water levels had prevented pile driving operations for a time. Plaintiff cannot insist that the contracting officer grant a postponement of a completion date because it failed to recognize a patent ambiguity.

### 4. *Ambiguity*

■ Plaintiff asserts that it reasonably interpreted the contract not to require the construction of an underwater timber bracing. *Contra proferentum*, the doctrine whereby a non-drafting party's interpretation of a latently ambiguous contract will prevail, applies when a contractor's reading of an ambiguous provision is reasonable in itself. *Turner Constr. Co.*, 819 F.2d at 286. The reasonableness of a contractor's interpretation of contract provisions is a question of law. *Teledyne Lewisburg v. United States*, 699 F.2d 1336, 1338 (Fed.

---

7. In this regard, however, NAVFAC contends that it did accommodate plaintiff's requests for performance delays. NAVFAC repeatedly granted plaintiff's requests to extend the completion date on the contract until September 1986, thus affording plaintiff a prolonged extension.

Cir.1983). The court has ruled that the contract drawings unambiguously show that the timber bracing is underwater. According to plaintiff, its understanding that the work could have been undertaken without the expense and insurance occasioned by marine divers was reasonable and only the presence of references to such by NAVFAC in the initial stages of contracting would have put it on notice of the need for divers.

In pursuing this line of argument, plaintiff presumes that the contract harbored a latent ambiguity and questions whether it was reasonable for the contractor to have surmised that divers would be necessary. However, only if the court decides that an ambiguity was not patent does it reach the question whether plaintiff's interpretation was reasonable. The inquiry is not focused on the reasonableness of the contractor's interpretation until the court has first determined that a patent ambiguity does not exist.

Mr. Thompson averred that he has been "engaged for years in the marine construction business ... with particular emphasis in marine construction involving structures abutting the Mississippi River including wharf and dock construction...." Affidavit of Michael J. Thompson, Jan. 29, 1990, ¶ 12. Mr. Thompson further averred that on September 11, 1984, he personally visited the job site pre-bid and saw the lower horizontal dock bracing exposed above the river water level. However, Mr. Thompson stated in a letter to the ROICC dated September 16, 1985, that "[t]he attached river stage hydrographs show that the river no longer falls below zero as it did when the original wharf was constructed."[8] A party may not defeat a summary judgment motion by instigating controversy with its own position on the facts. RUSCC 56(c); *Sohm v. United States*, 3 Cl.Ct. 74, 77–78 (1983).

Mr. Thompson's site inspection on September 11, 1984, at which time he observed the lower bracing fully exposed above the water level of the river, evinces prudence on the contractor's part, insofar as the contractor familiarized itself with the actual conditions at the site, but is not material to resolving an ambiguity between what Mr. Thompson saw on his visit and what was depicted on the drawings. This conclusion follows from the fact that plaintiff could not reasonably assume that the contract called for installation during the low river stage. The letter from Mr. Hinrichs of the Port of New Orleans stating that it is general practice in the area to await low water levels to replace lower timber bracing does not enhance the reasonableness of plaintiff's interpretation of the ambiguity. Plaintiff's asserts that it intended originally to await the low water season to perform the work without the assistance of marine divers. However, the original completion date of June 27, 1985 (when the water was high), did not give plaintiff a low water season (the months from August to October) during which time the lower horizontal timber bracing purportedly could be replaced without the use of divers. According to Mr. Thompson, because of a fluke year the low water level characteristic of August–September did not fall low enough for replacement of the lower timber bracing without the use of divers. That fact does not add to the reasonableness of plaintiff's interpretation. Its interpretation of the contractual provisions does not qualify as reasonable, thereby negating the existence of the latent ambiguity for which plaintiff contends.

Plaintiff, relying on *Max Drill, Inc. v. United States*, 192 Ct.Cl. 608, 427 F.2d 1233 (1970) asserts that this is an instance of latent ambiguity. "What constitutes a type of omission sufficient to put plaintiff under obligation to make inquiries cannot be defined generally, but on an ad hoc basis of looking to what a reasonable man would find to be patent and glaring." *Max Drill*, 192 Ct.Cl. at 626, 427 F.2d at 1244 (citing *L. Rosenman Corp. v. United States*, 182 Ct.Cl. 586, 590, 390 F.2d 711, 713 (1968)).

*Max Drill* involved a latent ambiguity rather than a potentially patent one. The

---

8. Mr. Thompson in the same letter stated that "the river would have to be at –1 to –2 feet in order to accomplish this work [placing the lower 4 × 10 foot timber bracing] without a diver."

issue was whether or not wood sashes were to be built on windows mandated by a housing construction contract. The Court of Claims noted that "specific reference to wood sashes of any sort was not made in the contract." 192 Ct.Cl. at 615, 427 F.2d at 1238. Moreover, the court observed that "the first clear statement of the government's interpretation of the contract occurred one year after the contract was let." 192 Ct.Cl. at 619, 427 F.2d at 1240. In the case at bar, NAVFAC's requirement of structural supports was clearly expressed and, indeed, integral to the purpose for which it entered into this contractual arrangement, *i.e.*, to rejuvenate its boat wharf. The drawings contemplated that the bidder take whatever steps were necessary to accomplish that goal, within the bidder's proposed financial limits. In *Max Drill* an important element of the contract as contemplated by one party was left unstated until one year after a contractor's work had commenced, whereas in this case the matter in dispute forms a central and articulated part of the government's purpose.[9] In the circumstances, plaintiff's interpretation was not reasonable.

## CONCLUSION

Based on the foregoing, defendant's cross-motion for summary judgment is granted and plaintiff's motion for summary judgment is denied. The Clerk of the Court shall dismiss the complaint.

IT IS SO ORDERED.

---

**9.** In response to plaintiff's argument that the contract specifications are silent as to the use of divers, defendant points to General Contract Provision 2, which defendant quotes as advising: "Anything ... shown on the drawings and not mentioned in the specifications shall be of like effect as if shown or mentioned in both ..." and suggests that it is controlling. This part of the contract is not of record, so defendant's argument cannot be considered further.